UNITED STATES of America,

v.

John CUFF, Defendant.

No. S11 96 CR. 515(MBM).

United States District Court, S.D. New York.

March 4, 1999.

Mary Jo White, United States Attorney for the Southern District of New York, Christine Y. Chi, Andrew S. Dember, Sharon L. McCarthy, Assistant U.S. Attorneys, New York City, for U.S.

Irving Cohen, New York City, Carl J. Herman, Livingston, NJ, for John Cuff.

## OPINION AND ORDER

MUKASEY, District Judge.

John Cuff is charged in the captioned indictment with, among other crimes, the murders of nine persons. He objects to the government's Amended Notice of Intent to Seek the Death Penalty, dated August 6, 1998 (the "Amended Notice"), both for reasons that go to the particulars of that notice and for reasons that relate generally to the imposition of the death penalty. He moves to preclude the government from seeking the death penalty on some of the bases contained in the Amended Notice and, more broadly, from seeking that penalty at all.

For the reasons set forth below, Cuff's motion is denied in all respects save one: the government will be barred from arguing to the jury that use of a firearm is an aggravating factor warranting imposition of the death penalty.

## I.

The sequence of events that led to the filing of the Amended Notice is as follows. The first of the several superseding indictments in this case under which the government sought the death penalty against Cuff was S3 96 Cr. 515, filed on February 9, 1997, which charged Cuff with participating in six intentional killings as part of a continuing criminal enterprise that included the sale of narcotics ("CCE"), in violation of 21 U.S.C. § 848. On December 16, 1997, the Attorney General authorized prosecutors to seek the death penalty in connection with five of those six killings. The government filed its initial notice of intent to seek the death penalty against Cuff for those five killings on January 8, 1998. The CCE statute lists certain aggravating factors the government may rely on in seeking the death penalty. See 21 U.S.C. § 848(n). The statute also permits the government to rely on other factors not specifically listed, provided that it gives notice of those nonstatutory factors along with the statutory factors it intends to rely on in seeking the death penalty, such notice to be provided a reasonable time before trial. See id. § 848(h)(1)(B).

Just after the authorization referred to above was issued by the Attorney General, but before the government filed its initial notice, the current superseding indictment was returned, designated S11 96 Cr. 515. The new indictment charged Cuff with four additional death-eligible CCE murders. Two of those murders occurred after passage of the Federal Death Penalty Act, 18 U.S.C. § 3591 et seq. ("FDPA"), which made Cuff eligible for the death penalty under that statute as well as under the CCE statute. On June 8, 1998, the Attorney General authorized prosecutors to seek the death penalty with respect to the four additional murders. The government sought leave of court on June 16, 1998 to file its Amended Notice, and filed the Amended Notice on August 7, 1998. The Amended Notice declares the government's intention to seek the death penalty as to nine murders—the five authorized initially and the four added in the S11 superseding indictment.

The FDPA contains a sentencing scheme similar to the one in the CCE statute in that it specifies certain aggravating factors that the government may rely on, adds a more general aggravating category of impact on a victim or the victim's family, and permits consideration of non-statutory aggravating factors. See id. § 3592(c)-(d). Again, the government is required to provide notice to the defendant a reasonable time before trial of the decision to seek the death penalty, and of the aggravating factors to be relied upon. See id. § 3593(a).

The Amended Notice lists the same CCE statutory factors, and non-statutory factors, for the four additional murders in the S11 indictment as the initial notice did for the five covered murders in the S3 indictment, and repeats those factors for the earlier murders. The statutory factors are: (1) pecuniary gain; (2) substantial premeditation; and (3) heinous, depraved or cruel manner of killing. The non-statutory factors are: (1) future dangerousness; (2) multiple intentional killings; and (3) victim impact. In addition, for the two murders covered by the FDPA, the Amended Notice reiterates the same three statutory aggravating factors listed as CCE aggravating factors, which appear also in the FDPA—(1) pecuniary gain; (2) substantial planning and premeditation; and (3) heinous, depraved or cruel manner of killing—as well as the factor of victim impact. The Amended Notice adds a fourth statutory aggravating factor for the two murders covered by the FDPA that is provided for under that statute but not under the CCE statute: (4) continuing

criminal enterprise involving drug sales to minors. *See id.* § 3592(d)(5). Finally, the Amended Notice adds as a nonstatutory aggravating factor, for the two murders covered by the FDPA, the use of a firearm during the commission of the offense.

## II.

■ Cuff challenges both the timing and the content of the Amended Notice, arguing that the government's delay in filing it was improper and that the Amended Notice should not be permitted to contain aggravating factors under the FDPA.

Both the CCE statute and the FDPA permit the government to amend its notice of intent to seek the death penalty upon a showing of "good cause." 21 U.S.C. § 848(h)(2); 18 U.S.C. § 3593(2). Cuff would have me amend both statutes to require the government to prove excusable neglect in not charging additional murders earlier, and in failing to include in the first notice of intent to seek the death penalty the murders later included as well as reliance on the FDPA. Cuff's position offends the language of both statutes, and longstanding case law that attaches " '[t]he presumption of regularity' " to a prosecutor's charging decisions and holds that, " 'in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties.' " *United States v. Armstrong,* 517 U.S. 456, 464, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996) (quoting *United States v. Chemical Found., Inc.,* 272 U.S. 1, 14–15, 47 S.Ct. 1, 71 L.Ed. 131 (1926)). Absent some showing of an unlawful or improper motive in the government's charging decision, or its timing, I have no authority to compel the government to prove excusable neglect. *See United States v. Batchelder,* 442 U.S. 114, 123–24, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979).

It is obvious from the chronology set forth above that the government could not have given notice of its intent to seek the death penalty with respect to the additional murders in the S11 indictment before June 1998 because it had not yet received authorization from the Attorney General to seek the death penalty in connection with those additional murders. Cuff has shown no prejudice in permitting the Amended Notice in that he has had ample time to prepare to meet the additional charges in the S11 indictment, and all aggravating factors in the Amended Notice. There was no impermissible delay here.

Further, to the extent that Cuff argues there will be undue confusion at the penalty phase if the jury is asked to make findings under both the CCE statute and the FDPA with respect to the same murders, that argument is mooted by the government's representation, to which it will be held, that it will elect following the guilt phase to proceed as to Cuff only under either the CCE statute or the FDPA, depending on the jury's verdict.

## III.

■ Cuff attacks both the CCE statute and the FDPA as unconstitutional for failing to provide for meaningful appellate review in three respects: (1) by failing to provide for mandatory appellate review; (2) by limiting the scope of review to certain specified errors, thereby requiring affirmance even in the presence of other and otherwise sufficient errors; and (3) by denying equal protection in that inmates covered by the statute are singled out for diminished appellate review. Whatever the merits of these arguments, I find that they are not properly raised at this time and, to the extent they relate to the scope of appellate review, should not be raised in this forum.

Cuff's arguments are all directed at the availability and scope of appellate review for the imposition of a sentence of death. At the moment, however, Cuff has not even been tried—let alone sentenced to death. Thus, he has not yet suffered any harm as a result of the lack of mandatory appellate review or that review's allegedly restricted scope. Any harm to Cuff that

would be attributable to the nature and extent of the appellate review process "is simply too speculative at this time for the Court to reach the question on the merits." *United States v. Frank*, 8 F.Supp.2d 253, 271 (S.D.N.Y.1998). Whether the problem is framed as an issue of ripeness or an issue of standing, therefore, Cuff's arguments are not properly raised at this time.

Further, to the extent that Cuff seeks to challenge the statutes on the ground that they unconstitutionally restrict the scope of appellate review, his arguments should not be raised in this forum. I am aware that several other district courts have entertained challenges of this nature—in each instance, I note, rejecting them. *See Frank*, 8 F.Supp.2d at 271–73; *United States v. McVeigh*, 944 F.Supp. 1478, 1484–85 (D.Colo.1996); *United States v. Walker*, 910 F.Supp. 837, 844–45 (N.D.N.Y.1995); *United States v. Pitera*, 795 F.Supp. 546, 566–67 (E.D.N.Y.1992); *United States v. Pretlow*, 779 F.Supp. 758, 761–64 (D.N.J. 1991); *cf. United States v. Nguyen*, 928 F.Supp. 1525, 1548 & n. 23 (D.Kan.1996) (considering and rejecting the defendant's argument with respect to the availability of meaningful appellate review, albeit noting that "the contention is more appropriate for appellate consideration in the event of conviction and a sentence of death"). Nevertheless, my colleagues' decisions notwithstanding, I do not believe it is the place of a district court to hold forth on the scope of a higher court's review, let alone whether that review complies with the Constitution; such matters are for the Court of Appeals to decide, if necessary, not for me. Moreover, in the event that Cuff's arguments are ultimately considered and found to have any merit, the proper remedy would appear to be an enlargement of the scope of appellate review, not reversal of the death penalty or invalidation of the statute generally; such relief is plainly beyond the powers of this court to grant. Accordingly, Cuff's motion to bar imposition of the death penalty on these grounds is denied.

### IV.

In his brief addressed to the initial notice of intent to seek the death penalty, Cuff argues that the death penalty is applied in a racially discriminatory manner and that the penalty itself cannot be administered in a way that avoids unacceptable risk of error and, for these reasons, that it is cruel and unusual punishment. These arguments are staples of extra-judicial debates about the death penalty, but they have long since been resolved, as applied to litigated cases, against the position Cuff argues here. *See McCleskey v. Kemp*, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

■ Cuff has sought discovery addressed to determining racial statistics for charging and sentencing defendants in death penalty cases, but both the discovery he seeks and the argument he would construct with the fruits of that discovery are beside the point. In order to prove an equal protection violation resulting from a charging decision in a death penalty case, a defendant must show that the penalty is sought to be applied in discriminatory manner as to him, and was motivated by a discriminatory intent as to him. *See McCleskey*, 481 U.S. at 292, 107 S.Ct. 1756 ("[A] defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination' *Whitus v. Georgia*, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967)[,] ... [and] that the purposeful discrimination 'had a discriminatory effect' on him" (quoting *Wayte v. United States*, 470 U.S. 598, 608, 105 S.Ct. 1524, 84 L.Ed.2d 547 (1985))).

Although Cuff seeks to erect an argument that would apply to a class of cases including his, he must show facts specific to his own case in order to make an equal protection claim. Statistics are not enough, and have been rejected as the basis for the sort of claim Cuff seeks to

advance. *See McCleskey,* 481 U.S. at 292–93, 107 S.Ct. 1756. Here, Cuff would have to show that others who have committed numerous drug-related murders have not been targets of the death penalty, and that he has been made subject to that penalty for discriminatory reasons. He has not suggested any fact that would tend to support either conclusion.

## V.

■ The CCE death penalty provisions include a requirement that the jury

> return to the court a certificate signed by each juror that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim, may be.

21 U.S.C. § 848(*o*)(1). Cuff, embracing arguments advanced by his codefendant Clarence Heatley,[1] argues that this section impermissibly restricts his presentation of mitigation evidence at the penalty phase in that it prevents him from introducing evidence that his race or economic circumstances contributed to his crime. The short answer to this contention is that the section in question does no such thing. The section is plainly intended to assure that the jurors do not consider either Cuff's race, color, religious beliefs, national origin, or sex, or any such attribute of his victims, not that they do not consider the effect on Cuff's behavior, if any, of any such attribute. Cuff's argument is without merit.

## VI.

Cuff attacks both the statutory and the non-statutory factors cited in the Amended Notice, arguing (1) that the former do not sufficiently channel the jury's discretion to impose the death penalty; (2) that the latter permit arbitrary imposition of the penalty while impermissibly delegating to prosecutors the authority to select enhancement factors, improperly permitting ex post facto punishment and consideration of unadjudicated criminal conduct; and (3) that both give the government the benefit of an unconstitutionally lax evidentiary standard. All of these attacks have been analyzed by other courts, and found unpersuasive, applying reasoning with which I agree. I see no need to repeat their analyses here, but only to cite the cases in which those analyses appear. For a discussion of the function of statutory aggravating factors generally, see *Tuilaepa v. California,* 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) ("First, the circumstance may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder .... Second, the aggravating circumstance may not be unconstitutionally vague."); and *Lowenfield v. Phelps,* 484 U.S. 231, 234–36, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). As to the sufficiency of the statutory factors in the CCE statute, see *Walker,* 910 F.Supp. at 846–50; and *Pitera,* 795 F.Supp. at 556–58. As to the propriety, including under the Ex Post Facto Clause of the Constitution, of permitting the government to charge non-statutory aggravating factors, see *Zant v. Stephens,* 462 U.S. 862, 878, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) ("But the Constitution does not require the jury to ignore other possible aggravating factors [apart from statutory factors] in the process of selecting, from among that class [of persons to whom one or more statutory factors apply], those defendants who will actually be sentenced to death."); *United States v. Kaczynski,* CR–S–96–259GEB GGH, 1997 WL 716487, at *4–7 (E.D.Cal.

---

1. Heatley has pleaded guilty based on the government's promise not to seek the death penalty and his own promise to accept life imprisonment, and will not stand trial in this case.

1997); *Walker,* 910 F.Supp. at 850–51; and *Pitera,* 795 F.Supp. at 558–59, 560–64. As to the propriety of considering unadjudicated criminal conduct at the sentencing phase, see *Kaczynski,* 1997 WL 716487, at *9–12. As to the sufficiency of the evidentiary standard at the sentencing phase, and the role of evidence at the sentencing phase, see *Kaczynski,* 1997 WL 716487, at *8–9; and *Pitera,* 795 F.Supp. at 564–66.

■ There is one exception to this blanket rejection of Cuff's arguments, and that relates to his assertion that there is no basis for citing as a statutory aggravating factor that any of the charged murders was committed in consideration for the receipt, or the expectation of the receipt, of anything of pecuniary value. *See* 21 U.S.C. § 848(n)(7); 18 U.S.C. § 3592(c)(8). The sections in question appear to be directed at a murder for hire or to collect insurance proceeds, or at least the sort of murder in which pecuniary gain can be expected to follow as a direct result of the crime. A murder from which pecuniary gain does not directly result would not appear to be within the reach of the statute. However, as the government notes, whether this factor applies or not will depend on the proof adduced at trial.

## VII.

■ Finally, Cuff argues that the government should not be permitted to argue that, as to the two homicides covered by the FDPA—of Sheila Berry and of Dale Graham—use of a firearm may be considered as a non-statutory aggravating factor. Here, for the following reasons, I agree with Cuff.

The government notes that the language in the Amended Notice relating to use of a firearm in connection with the two subject homicides is taken straight from 18 U.S.C. § 3592(d)(4), which specifies use of a firearm as a statutory aggravating factor for non-homicide death penalty cases. The government argues further that use of a firearm fulfills the two constitutional conditions for an aggravating factor specified in *Tuilaepa,* 512 U.S. at 972, 114 S.Ct. 2630—*i.e.,* (1) that the factor not apply to all defendants convicted of the underlying crime, and thereby serve to narrow the class of defendants subject to the death penalty; and (2) that the factor not be unconstitutionally vague. Use of a firearm, the government reasons, meets both conditions.

The government's reasoning is impeccable, as far as it goes, but it does not go far enough. A predicate to fulfilling the constitutional conditions for an aggravating factor is that the disputed factor be an aggravating factor in the first place. Use of a firearm in connection with a homicide does not meet that predicate for the simple reason that use of a firearm does not, in any rational sense, make a homicide worse, whether one looks at it from the standpoint of the crime, the victim or the perpetrator. To illustrate, it may be useful to consider use of a firearm in connection with a crime other than a homicide, as well as other aggravating factors in connection with a homicide. Thus, if a firearm is used in connection with another crime, such use makes it more likely that that crime will succeed, as well as more likely that a fatality may ensue. However, if the crime is a homicide to start with, likely success and loss of life are moot; to the extent that use of a firearm might endanger additional lives, the factor of grave risk of death to additional persons is covered by statute. *See* 18 U.S.C. § 3592(c)(5). Further, among the proper non-statutory aggravating factors for a homicide is the degree of impact on the victim's family. That factor too is plainly an aggravating one because of the additional suffering imposed as a result of the crime. Use of a firearm to commit a homicide, however, does not necessarily add to the victim's suffering, or that of his family or other survivors. Finally, a defendant's future dangerousness or lack of remorse may be relevant in deciding on the appropriateness of the death penalty because of what it discloses about that defendant. Use of a

firearm to commit a homicide does not disclose anything relevant about a defendant that would not be disclosed by use of some other instrument to commit a homicide.

To illustrate the problem another way, if the government were correct that any factor may be considered that meets the constitutional conditions set forth in *Tuilaepa*—that it not apply to all defendants and that it not be unconstitutionally vague—then the government might just as properly charge as an aggravating factor that a homicide was committed on a Tuesday. That factor would not apply to all defendants and would not be unconstitutionally vague. Neither would it make any sense.

The non-statutory aggravating factor for use of a firearm in connection with the murders covered by the FDPA is stricken.

\*    \*    \*    \*    \*    \*

For the foregoing reasons, Cuff's motions addressed to the Amended Notice are denied, except as specifically set forth above.

SO ORDERED: