**UNITED STATES of America**

v.

**Eugene Lamont FRIEND and Travis McKinnley Friend.**

**Nos. Crim.A. 3:99CR201–01, 3:99CR201–02.**

United States District Court,
E.D. Virginia,
Richmond Division.

April 19, 2000.

David Novak, Assistant United States Attorney, United States Attorney's Office, Richmond, VA, for Government.

Gerald T. Zerkin, Richmond, VA, David P. Baugh, Richmond, VA, for Eugene Friend.

Jeffrey Everhart, Rice, Everhart & Baber, Richmond, VA, Aubrey E. Hammond, Jr., Richmond, VA, for Travis Friend.

## MEMORANDUM OPINION

PAYNE, District Judge.

Eugene Lamont Friend ("Friend"), along with his mother, Vallia Friend, his brother, Travis Friend, and John Doe, were indicted on one count of conspiracy to interfere with interstate commerce by violence, and two counts of carjacking, one of which resulted in the death of the victim.[1] On October 21, 1999, the United States filed a Notice of Intent to Seek a Sentence of Death for Eugene Friend and his brother, Travis, if either were convicted of Count Three of the Superseding Indictment, which alleged carjacking that resulted in the death of Samuel Lam. In so doing, the United States gave notice, as required by 18 U.S.C. § 3593(a), of its intention to argue several statutory and nonstatutory aggravating factors consid-

ered by the United States to warrant imposition of a sentence of death.

Eugene Friend moved to strike certain of the nonstatutory aggravating factors listed in the Government's Notice of Intent to Seek a Sentence of Death. A hearing was held on that and other motions. At the conclusion of that hearing, Friend's motion was granted in part and denied in part and the motion to strike nonstatutory aggravating factor 10 ("Factor 10") was taken under advisement.

Factor 10 alleged that "Defendant EUGENE LAMONT FRIEND and co-defendant Travis McKinnley Friend discussed killing Charlene Thomas after the murder of Samuel Lam because she was a potential witness against them." Notice of Intent to Seek a Sentence of Death, at 4. To further understand the "discussion" which is asserted as the predicate for Factor 10, the Court instructed the United States to file a proffer of the evidentiary basis for the factor. In response, the United States explained that, while Eugene and Travis Friend were incarcerated, another inmate overheard the "discussion," which went like this:

Travis Friend told Eugene Friend that their mother had been arrested. Eugene Friend told his brother that they had to "stick together." Travis Friend stated, "You know it was that whore" (referring to Charlene Thomas). Travis Friend then said, "they should have gotten rid of her in Texas like I told you." Eugene Friend responded: "Man, that was my woman." Travis Friend replied: "Yeah, but this is our mother." Eugene Friend told Travis Friend that he knew what they had to do now. He told Travis that they had to turn this around.

---

1. The original Indictment was returned on June 21, 1999, and charged Eugene and Travis Friend with conspiracy to interfere with commerce by violence. A Superseding Indictment was returned July 20, 1999, which charged them with one count of conspiracy to interfere with interstate commerce by violence, and two counts of carjacking. A Second Superseding Indictment was returned on

December 20, 1999, which charged them with these same counts and added a juvenile defendant, who had been transferred to the jurisdiction of the federal district court for trial as an adult. A Redacted Second Superseding Indictment was returned on January 24, 2000, which, pursuant to an Order of this Court, replaced the true name of the juvenile with "John Doe."

Travis Friend got very upset and began crying about his mother. Eugene Friend repeatedly told Travis Friend that they had to "stick together."

Government's Proffer in Support of Nonstatutory Aggravating Factor 10.

For the reasons which follow, the motion to strike Factor 10 is granted.

## DISCUSSION

To assess whether Factor 10 qualifies for the important role assigned to an aggravating factor in the death penalty calculus established by the federal death penalty statute, 18 U.S.C. § 3591 *et seq.*, (hereinafter referred to as the statute or as the "FDPA"), it is necessary to consider Factor 10 in the context of the statutory scheme which controls imposition of the death penalty and in perspective of the death penalty jurisprudence reflected in the decisions of the Supreme Court of the United States. When thusly assessed, Factor 10 does not qualify for the constitutionally significant role assigned to aggravating factors by the statute and the controlling decisional law.

**The Statutory Framework and the Role Assigned by Statute to Nonstatutory Aggravating Factors**

■ If Eugene and Travis Friend are convicted of Count Three, the task of determining whether the death penalty will be imposed falls upon the jury. To make this determination, the jury must complete several sequential procedures which are prescribed by statute. *See* 18 U.S.C. § 3591, *et seq.; United States v. Davis*, 912 F.Supp. 938, 943 (E.D.La.1996). First, the jury must decide the threshold issue whether the homicide was committed with the requisite "intent." *See* 18 U.S.C. § 3591(a)(2)(A)–(D).

A death penalty will be imposed only if the defendant "intentionally killed the victim or intentionally engaged in other specifically defined conduct which resulted in the death of the victim." Thus, only if the jurors unanimously conclude that one of those circumstances has been established beyond a reasonable doubt, can they move to the next stage of the statutory assessment procedure. In that respect, the statute provides that a defendant whose conduct has been found to fit within one of the intent criteria set by § 3591(2)(A)–(D) "shall be sentenced to death if, after consideration of the factors set forth in section 3592 in the course of a hearing held pursuant to section 3593, it is determined that imposition of a sentence of death is justified." 18 U.S.C. § 3591(a).

At the second step of the death penalty assessment scheme, the jury "shall consider each of [any of the specifically enumerated sixteen] aggravating factors for which notice has been given and determine which, if any, exist." 18 U.S.C. § 3592(c). Also, the jury "may consider whether any other aggravating factor for which notice has been given exists." *Id.* The sixteen enumerated aggravating factors often are referred to as statutory aggravating factors and they must be considered·if notice of them is given. Any other factor thought by the United States to warrant imposition of the death penalty may be considered under the last sentence in the statute. Also, the jury "shall consider any mitigating factor, including [eight enumerated factors]." 18 U.S.C. § 3592(a).

At the sentencing hearing, "information may be presented as to any matter relevant to the sentence, including any mitigating or aggravating factor permitted or required to be considered under section 3593." 18 U.S.C. § 3593(c). That "[i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id.* The United States is required to prove the existence of an aggravating factor beyond a reasonable doubt whereas the defendant is required to establish the existence of a mitigating factor "by a preponderance of the information." *Id.*

After the presentation of evidence and argument, the order of which is statutorily prescribed, the jury is required to consider all the information received during the hearing and then is required to "return special findings identifying any aggravating factor or factors *set forth in section 3592* found to exist and *any other aggravating factor for which notice has been provided....* If no aggravating factor *set forth in section 3592* is found to exist, the Court shall impose a sentence other than death authorized by law." 18 U.S.C. § 3593(d) (emphasis added).

Thereafter, if, for an offense of the type charged in Count Three, "an aggravating factor required to be considered under section 3592(c) is found to exist," then the jury "shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." 18 U.S.C. § 3593(e)(2). When the weighing of factors is concluded, the jury is required to recommend whether the defendant should be sentenced to death. *See id.*

Read together, the provisions of 18 U.S.C. §§ 3593(d) and (e) permit a recommendation of a death sentence only if one of the statutory aggravating factors has been found to exist beyond a reasonable doubt.[2] And, 18 U.S.C. § 3593(e) permits

the weighing process to occur only if (for an offense of the type alleged in Count Three) an aggravating factor "required to be considered under section 3592(c) is found to exist." 18 U.S.C. § 3593(e)(2). Moreover, the aggravating factors which the jury are required to consider ("shall consider" in section 3592(c)) are the sixteen specifically enumerated factors. The other nonstatutory aggravating factors for which notice, of course, also must be given, are factors that the jury "may consider." 18 U.S.C. § 3592(c) (last paragraph).

From the foregoing, it is apparent that a *statutory* aggravating factor must be found to exist before the jury is directed to consider any other aggravating factors or any mitigating factors.[3] Once the defendant has been convicted, the threshold finding of intent has been made, and a statutory aggravating factor has been proved beyond a reasonable doubt, the jury is required to consider whether all the aggravating factors, statutory or nonstatutory, outweigh all the mitigating factors. Of course, if there are no mitigating factors, then the jury must decide whether the aggravating factors, statutory and nonstatutory, should result in the imposition of a sentence of death.[4]

## General Principles of Death Penalty Jurisprudence

The FDPA, of course, was enacted against a substantial jurisprudential base of Supreme Court decisions respecting the

**2.** 18 U.S.C. § 3593(d) defines the factor for which special findings have to be made as "any aggravating factor or factors set forth in section 3592" and "any other aggravating factor for which notice has been provided."

**3.** Unlike the statutory death penalty procedure set forth in 21 U.S.C. § 848, the FDPA does not textually require that the statutory aggravating factors serve as an eligibility screen and thus it is arguable that a finding of any aggravating factor, statutory or nonstatutory, would permit the weighing means to go forward. That interpretation of the statute, however, would give rise to the anomaly of two similar death penalty statutes with substantially different roles for aggravating factors. *Compare* 21 U.S.C. § 848(k) *with* 18

U.S.C. § 3593(d) & (e). Of course, this would present a thicket of constitutional issues. *See Zant v. Stephens*, 462 U.S. 862, 878–79, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983). Because the parties here agree that the interpretation used by the Court is the correct one, it is unnecessary to explore the issue further.

**4.** In this case, the United States alleges, as statutory aggravating factors, that Friend committed the offense charged in Count Three "as consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value," 18 U.S.C. § 3592(c)(8), and "after substantial planning and premeditation to cause the death of a person." 18 U.S.C. § 3592(c)(9).

requirements for a constitutionally acceptable death penalty statute. Congress was no doubt aware of that significant jurisprudential base when, in 1994, it enacted the FDPA. In any event, Congress is presumed to have been aware of those decisions. Hence, it is necessary to examine the decisions of the Supreme Court to assess the role ascribed in the FDPA to nonstatutory aggravating factors and to ascertain the credentials which a putative nonstatutory factor must possess before it can assume the significant role in the death penalty calculus contemplated by the statute.

As has been observed in other capital proceedings, the penalty phase of a capital case requires a reconciliation between "two, sometimes-competing, but nonetheless fundamental, constitutional principles...." *United States v. Beckford,* 964 F.Supp. 993, 999 (E.D.Va.1997); *Davis,* 912 F.Supp. at 941. The first of these principles demands a heightened reliability in capital sentencing because the sentence of death is final, and therefore qualitatively different from other punishments.[5] The second principle emphasizes the importance, indeed the constitutional necessity, of presenting to the sentencing jury as much information as possible to assure that the sentence actually imposed is individualized.[6]

In 1972, the Supreme Court, in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), held that the imposition and carrying out of the death penalty as it then existed in the states of Georgia and Texas was cruel and unusual punishment, and therefore violated the Eighth Amendment as applied to the States by the Fourteenth Amendment. A principal reason for the decision in *Furman* was the "untrammeled discretion" afforded sentencing juries and judges in the two states whose capital sentencing procedures were under scrutiny. The Court explained that the "uncontrolled discretion" in the penalty schemes there at issue

> enable[d] the penalties to be selectively applied, feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority, and saving those who by social position may be in a more protected position.

*Id.* at 255, 92 S.Ct. at 2735. That unfettered discretion resulted from a complete lack of standards to provide a "meaningful basis" for distinguishing who should live or die, and, therefore, the death penalty procedures in Georgia and Texas yielded death sentences which the Court considered to be "wantonly ... and freakishly imposed." *Id.* at 313, 92 S.Ct. at 2764.

**5.** *See Woodson v. North Carolina,* 428 U.S. 280, 305, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976); *Walker,* 910 F.Supp. at 842 (citations omitted); *see also Johnson v. Mississippi,* 486 U.S. 578, 590, 108 S.Ct. 1981, 1988, 100 L.Ed.2d 575 (1988); *Ford v. Wainwright,* 477 U.S. 399, 410–11, 106 S.Ct. 2595, 2602–03, 91 L.Ed.2d 335 (1986); *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973 (1978); *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977) (plurality opinion); *Beckford,* 964 F.Supp. at 999; *Davis,* 912 F.Supp. at 947 (citing *Lockett v. Ohio,* 438 U.S. 586, 602–04, 98 S.Ct. 2954, 2963–65, 57 L.Ed.2d 973 (1978)); *United States v. Bradley,* 880 F.Supp. 271, 284 (M.D.Pa.1994) (citing *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972)); *United States v. Pitera,* 795 F.Supp. 546 (E.D.N.Y.1992).

**6.** *See Jurek v. Texas,* 428 U.S. 262, 276, 96 S.Ct. 2950, 2958, 49 L.Ed.2d 929 (1976)

("What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine."). "[I]n capital cases the fundamental respect for humanity underlying the Eight Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." *Woodson,* 428 U.S. at 304, 96 S.Ct. at 2991 (citations omitted); *see also Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991); *Barefoot v. Estelle,* 463 U.S. 880, 103 S.Ct. 3383, 77 L.Ed.2d 1090 (1983); *Lockett,* 438 U.S. at 608, 98 S.Ct. at 2966–67 (Burger, J., joined by Stewart, Powell, Stevens, JJ.); *Bradley,* 880 F.Supp. at 285 (citing *Jurek,* 428 U.S. at 276, 96 S.Ct. at 2958).

Four years later, in *Gregg v. Georgia,* 428 U.S. 153, 188–89, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), the Court upheld a revised death penalty statute in Georgia. In so doing, the Court reaffirmed the principles announced in *Furman* by requiring that "discretion ... be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.*

In *Gregg,* the Supreme Court recognized that "[j]ury sentencing has been considered desirable in capital cases in order 'to maintain a link between contemporary community values and the penal system, a link without which the determination of punishment could hardly reflect "the evolving standards of decency that mark the progress of a maturing society."'" *Gregg,* 428 U.S. at 190, 96 S.Ct. at 2933 (quoting *Witherspoon v. Illinois,* 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 1775 n. 15, 20 L.Ed.2d 776 (1968), quoting *Trop v. Dulles,* 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958) (plurality opinion)). However, the Court went on to observe that:

> Since the members of the jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given [respecting the imposition of punishment]. To the extent that this problem is inherent in jury sentencing, it may not be totally correctable. It seems clear, however, that the problem will be alleviated if the jury is given *guidance* regarding the *factors about the crimes and the defendant* that the state, representing organized society, deems *particularly relevant to the sentencing decision.*

*Gregg,* 428 U.S. at 192, 96 S.Ct. at 2934 (emphasis added) (internal citations omitted).

The Court then pointed out that, in fact, standards had been developed to guide discretion of juries in death penalty sentencing and cited the Model Penal Code as support for the proposition "'that it is within the realm of possibility to point to the main circumstances of aggravation and of mitigation that should be weighed and weighed against each other when they are presented in a concrete case.'" *Id.* at 193, 96 S.Ct. at 2935 (quoting ALI, Model Penal Code § 201.6, cmt. 3, p. 71 (Tent. Draft No. 9, 1959)).

The Court then explained the purposes to be served by the circumstances of aggravation and mitigation that were to be weighed in the sentencing decision.

> While such standards [the circumstances of aggravation and mitigation that are to be weighed in the sentencing process] are by necessity somewhat general, they do *provide guidance to the sentencing authority and thereby reduce the likelihood that it will impose a sentence that fairly can be called capricious or arbitrary.* Where the sentencing authority is required to specify the factors it relied upon in reaching its decision, the safeguard of meaningful appellate review is available to insure that death sentences are not imposed capriciously or in a freakish manner.

*Gregg,* 428 U.S. at 193–94, 96 S.Ct. at 2935 (emphasis added). Thus, in *Gregg,* the Court declared that an aggravating factor is intended to provide the sort of guidance to the sentencing authority that will reduce the likelihood that a death sentence will be imposed capriciously and arbitrarily. The second goal to be served by aggravating factors is to permit appellate review of the findings respecting such factors to insure that the death penalty is not imposed capriciously or in a freakish manner.

On the same day it decided *Gregg,* the Supreme Court handed down *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), wherein the Court struck down a North Carolina death penalty statute which mandated imposition of a death sentence upon all convictions of first-degree murder. The statute violated the Eighth and Fourteenth Amendments for three reasons. First, the inexorable imposition of the death penalty upon all convictions of first-degree murder clashed

with society's evolving standards respecting imposition of death as a punishment. *See id.* at 301, 96 S.Ct. at 2989. Second, the North Carolina statute failed to "fulfill Furman's basic requirement by replacing arbitrary and wanton jury discretion with objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death." *Id.* at 303, 96 S.Ct. at 2990–91. Finally, North Carolina's statute failed "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant." *Id.,* 96 S.Ct. at 2991. And, in *Woodson,* the Court explained that the constitutional requirement of particularized consideration "rests squarely on the predicate that the penalty of death is qualitatively different from a sentence of imprisonment, however long"; thus, the Constitution requires "reliability in the determination that death is the appropriate punishment in a specific case." *Id.* at 305, 96 S.Ct. at 2991.[7]

In *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Court further explicated the role of aggravating factors in death penalty sentencing:

> Our cases indicate, then, that *statutory aggravating circumstances* play a constitutionally necessary function at the stage of legislative definition: they *circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting,* from among that class, those defendants who will actually be sentenced to death. What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.

*Zant,* 462 U.S. at 878, 103 S.Ct. at 2743 (emphasis added). In *Zant,* the Court

made clear that statutory aggravating factors served as eligibility criteria while nonstatutory aggravating factors were part of the selection process. *See also Tuilaepa v. California,* 512 U.S. 967, 971–72, 114 S.Ct. 2630, 2634–35, 129 L.Ed.2d 750 (1994) (distinguishing eligibility process from selection process). In *Lowenfield v. Phelps,* 484 U.S. 231, 244, 108 S.Ct. 546, 554, 98 L.Ed.2d 568 (1988), the Court once again considered "the necessary role of aggravating circumstances," beginning its consideration of that topic by observing that:

> To pass constitutional muster, a capital *sentencing scheme must 'genuinely narrow the class of persons eligible* for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' (Citations omitted) Under the capital sentencing laws of most States, the jury is required during the sentencing phase to find at least one aggravating circumstance before it may impose death. (Citations omitted) *By doing so [finding at least one aggravating circumstance], the jury narrows the class of persons eligible for the death penalty according to an objective legislation definition.* (citing *Zant,* 462 U.S. at 878, 103 S.Ct. at 2743).

*Lowenfield,* 484 U.S. at 244, 108 S.Ct. at 554 (emphasis added). As the Court then explained in *Lowenfield,* "[t]he use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion." *Id.* Thus, in *Lowenfield,* the Court clearly explained that a principal role to be served by an aggravating factor is to channel jury discretion.

---

7. Not long after *Woodson,* the Court decided *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977), wherein the Supreme Court vacated the sentence of death and held that the sentencing process itself was required to satisfy the requirements of the Due Process Clause. *See id.* at 358, 97 S.Ct. at 1204–05. After *Gardner,* it was clear that capital sentencing procedures were constrained by both the Eighth Amendment's prohibition against cruel and unusual punishment and by the Due Process clause of the Fifth Amendment.

Mindful of the role ascribed by the Supreme Court to aggravating factors, statutory and nonstatutory, Congress built into the FDPA aggravating factors whose purpose it is to guide the jury's determination of whether a defendant is, in the first instance, eligible for a sentence of death. To that end, Congress identified sixteen specific factors for use in making the eligibility decision. Additionally, Congress conferred upon prosecutors the discretion to formulate "other aggravating factors," specific to a given case, which, after appropriate judicial scrutiny, could be submitted to the jury for its consideration in the selection process. Under the sentencing scheme established by the FDPA, nonstatutory aggravating factors assume great significance in the selection decision because, along with the statutory aggravating factors, they are weighed against the mitigating factors in order to make the decision whether to impose the death penalty.

With the foregoing in mind, it is possible to formulate the basic criteria for assessing whether putative nonstatutory Factor 10 measures up to the statutory and constitutional requirements for an aggravating factor.

**The Standard for Assessing the Adequacy of Factor 10**

■ The analysis is framed by several observations made by the Supreme Court in *Tuilaepa v. California*. First, an aggravating factor must not be too broad. That is to say, it "may not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder." *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 2635, 129 L.Ed.2d 750 (1994) (citing *Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993)). If an aggravating factor applies to every defendant convicted of a crime for which death is a possible punishment, then the factor is constitutionally infirm because it provides no principled basis for distinguishing those who deserve capital punishment from those who do not. *See Arave*, 507 U.S. at 474, 113 S.Ct. at 1542.

■ Second, the aggravating circumstance may not be unconstitutionally vague. *See Tuilaepa*, 512 U.S. at 972, 114 S.Ct. at 2635 (citing *Godfrey v. Georgia*, 446 U.S. 420, 428, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980)). Vagueness is ascertained by assessing whether an aggravating factor is defined in terms too vague to provide adequate guidance to the sentencer. *See id.* (citing *Walton v. Arizona*, 497 U.S. 639, 654, 110 S.Ct. 3047, 3057–58, 111 L.Ed.2d 511 (1990)). To provide constitutionally acceptable guidance, the aggravating factor must have a "common-sense core of meaning … that criminal juries should be capable of understanding." *Tuilaepa*, 512 U.S. at 973, 114 S.Ct. at 2636 (citations omitted). Of course, a vague factor "creates an unacceptable risk of randomness, the mark of the arbitrary and capricious sentencing process prohibited by *Furman v. Georgia*." *Id.* at 974–75, 114 S.Ct. at 2636 (citations omitted). Hence, the factor, to be constitutionally acceptable, must not inject randomness into the sentencing process.

■ Thirdly, it is clear from *Gregg v. Georgia* that aggravating factors must be focused on circumstances that are considered by civilized society to be "particularly relevant to the sentencing decision." *Gregg*, 428 U.S. at 192, 96 S.Ct. at 2934. Or, as the Court explained in *Arave v. Creech*, the aggravating factor must be relevant in assisting the jury in distinguishing "those who deserve capital punishment from those who do not." *Arave*, 507 U.S. at 474, 113 S.Ct. at 1542.

■ Finally, it is essential that an aggravating factor be measured in perspective of the fundamental requirement of *heightened reliability* that is the keystone in making "the determination that death is the appropriate punishment in a specific case." *Woodson*, 428 U.S. at 305, 96 S.Ct. at 2991. The need for heightened reliability in making that decision is driven by the

fact that the death sentence is qualitatively different from any other sentence.

In assessing whether a proposed aggravating factor meets the criteria for that significant role, heightened reliability comes into play in assessing overbreadth, vagueness, and relevance. As to overbreadth, the requirement of heightened reliability assures that the proposed factor imposes an *"inherent restraint* on the arbitrary and capricious infliction of the death sentence," and, in so doing, prohibits factors that apply to almost all murders. *Zant,* 462 U.S. at 878, 103 S.Ct. at 2743 (citing *Godfrey v. Georgia,* 446 U.S. 420, 428–29, 100 S.Ct. 1759, 1764–65, 64 L.Ed.2d 398 (1980)) (emphasis added). As to vagueness, heightened reliability serves to underscore the requirement that the factor must genuinely narrow those eligible for the death penalty, *see id.,* and it also serves to foreclose an unacceptable risk of randomness in the sentencing process. *See Tuilaepa,* 512 U.S. at 974–75, 114 S.Ct. at 2636. As to relevance, heightened reliability controls the quality of the information given to the jury in the sentencing proceeding by assuring that the sentencer receives evidence that, in logic and law, bears on the selection of who, among those eligible for death, should die and who should live. *See Gregg,* 428 U.S. at 192, 96 S.Ct. 2909; *see also United States v. Davis,* 912 F.Supp. at 943–44. The concept of heightened reliability, then, is a way of bolstering these three constitutional requirements.

However, when assessing a nonstatutory aggravating factor—which, by definition, lacks the stamp of approval that Congress has bestowed upon the statutory aggravating factors—the concept of heightened reliability plays an independently significant role. That is because heightened reliability drives the individualized determination that is fundamental to a constitutionally valid death penalty scheme. And, in ascertaining whether a proposed factor passes the necessarily high bar set for aggravating factors, heightened reliability is the key to a constitutionally defensible "determination that death is the appropriate punishment in a specific case." *Woodson,* 428 U.S. at 305, 96 S.Ct. at 2991.

The analytical framework outlined above is based upon decisions of the Supreme Court addressing aggravating factors in state statutes. However, application of those same criteria would seem to be an appropriate measure of the adequacy of a nonstatutory aggravating factor. It is now appropriate to measure the adequacy of Factor 10 against this analytical framework.

### 1. Overbreadth or General Applicability

■ The requirement that a factor not be overly broad in application is readily satisfied here because, by its text, Factor 10 clearly would not apply to all of those convicted of murder but only to a subclass of such defendants. Hence, this aspect of the analysis requires no further development.

### 2. Vagueness

■ In the context of death penalty jurisprudence, the "controlling objective" for assessing eligibility and selection factors for vagueness is whether the statutory scheme provides a process that "is neutral and principled so as to guard against bias or caprice in the sentencing decision." *Tuilaepa,* 512 U.S. at 973, 114 S.Ct. at 2635. When applied to assessment of an aggravating factor that means that factor must have some "common-sense core of meaning . . . that criminal juries should be capable of understanding." *Id.* That core of common understanding can be supplied by decisional law of the state courts when the review is of a state statutory factor alleged to be vague. *See, e.g., Walton v. Arizona,* 497 U.S. 639, 655, 110 S.Ct. 3047, 3057–58, 111 L.Ed.2d 511 (1990). And, those principles also would apply to permit that meaning to be supplied by instructions of a district court when the review is of a nonstatutory factor offered by the prosecutor. *See United*

*States v. Jones,* 132 F.3d 232, 251 (5th Cir.1998).

Factor 10 alleges that Friend and his brother Travis "discussed killing Charlene Thomas after the murder of Samuel Lam because she was a potential witness against them." Rather obviously, the discussion of possibly killing a potential eyewitness to the crime of conviction has a common-sense core meaning that criminal juries should be capable of understanding. The inquiry does not stop there, however, for the question must be asked whether, as articulated, this factor creates an unacceptable risk of randomness in sentencing because the language articulating the factor is too vague to provide adequate guidance to the sentencer. To assure that an aggravating factor does not resurrect the randomness prohibited by *Furman,* the Supreme Court has insisted that the sentencer be furnished "with ' "clear and objective standards" that provide "specific and detailed guidance," and that "make rationally reviewable the process of imposing a sentence of death." ' " *Walton,* 497 U.S. at 660, 110 S.Ct. at 3061 (Scalia, J., concurring in part and in concurring in the judgment) (citing *Godfrey v. Georgia,* 446 U.S. at 428, 100 S.Ct. at 1765).

Factor 10 is articulated in standards sufficiently clear and objective that: (i) with appropriate instruction, the jury will have specific and detailed guidance in its meaning; and (ii) the process for imposing a sentence of death is rationally reviewable. Hence, Factor 10 is not unconstitutionally vague under the vagueness analysis required by *Walton v. Arizona* and *Tuilaepa v. California* and the decisions upon which they are based.

**3. Death Penalty Relevance and the Requirement of Heightened Reliability in Nonstatutory Aggravating Factors**

▮ As is made clear in *Furman, Gregg,* and *Woodson,* relevance in death penalty jurisprudence means relevance in determining that death is the appropriate punishment for a specific defendant in a specific case. *See, e.g., Woodson,* 428 U.S.

at 305, 96 S.Ct. at 2991. And, as pertains to the identification of factors intended to give guidance in making the decision whether to impose a death sentence or life imprisonment, relevance means relevance to the issue: who should live or die. That is because aggravating circumstances are "standards to guide the making of the choice between the alternative verdicts of death and life imprisonment." *Walton,* 497 U.S. at 648, 110 S.Ct. at 3054 (citing *Poland v. Arizona,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986)). Of course, a factor must reasonably justify the imposition of a more severe sentence on the defendant compared to others who have been found guilty of murder. *See Zant,* 462 U.S. at 877, 103 S.Ct. at 2742. Moreover, as explained above, in the context of a nonstatutory aggravating factor, heightened reliability requires that the factor itself must play a proper role in selecting who should die from those eligible for a sentence of death. That selection, under the FDPA, occurs in the weighing process.

Thus, relevance and heightened reliability, in the context of assessing a nonstatutory aggravating factor in a death penalty scheme, are two sides of the same coin. Together, they assure the twin constitutional prerequisites of affording a rational basis for deciding that in a particular case death is the appropriate punishment and of providing measured guidance for making that determination. Those objectives can only be accomplished if the proposed aggravating factor raises an issue which (a) is of sufficient seriousness in the scale of societal values to be weighed in selecting who is to live or die; and (b) is imbued with a sufficient degree of logical and legal probity to permit the weighing process to produce a reliable outcome.

There is, in the decisions involving the FDPA, very sparse analysis respecting whether particular nonstatutory aggravating factors pass constitutional muster. However, in a thoughtful analysis of the FDPA, in *United States v. Davis,* 912 F.Supp. 938 (E.D.La.1996), the district

court concluded that the statutory factors themselves could supply a framework for assessing the relevance and heightened reliability of a nonstatutory aggravating factor. *See Davis,* 912 F.Supp. at 944. In that analysis, the court found a measure of reliability and relevance in assessing the nature of the statutory factors and attempting to ascertain why they were thought by Congress to be "substantial enough to sustain the death penalty for a particular offender." Although the court spoke in terms of relevance and "admissibility" of the nonstatutory aggravating factors, *id.,* the substance of the analysis actually examines death penalty relevance and reliability by examining the nature of the statutory factors themselves.

Thus, as in *Davis,* it is appropriate to inform the analysis here by reference to the aggravating factors set out in the text of the FDPA. Ten of the statutory aggravating factors for homicide involve circumstances surrounding the commission of the homicide which make that already-serious crime sufficiently more serious to render it a death eligible crime.[8] The remaining six statutory aggravating factors have to do with the criminal history of the defendant and each describes a previous conviction of a very serious crime.[9] An assessment of the factors prescribed by Congress as essential to qualifying a particular homicide as a death-eligible one teach that, as to relevance, an aggravating factor must have a substantial degree of gravity to be the sort of factor which is appropriate for consideration in deciding who should live and who should die. The concept of reliability is reflected in the statutory aggravating factors because those factors represent the quality of conduct or the kind of personal characteristics of the defendant which, over time and through judicial testing, have found a widespread acceptance in society as matters genuinely probative— both logically and within the parameters of the death penalty jurisprudence—of who,

from among the eligible, should be selected for a sentence of death.

As explained in *Davis,* it should be presumed that Congress would not craft a statute which would defeat the fundamental objectives reflected in the Supreme Court's death penalty jurisprudence by relaxing the standards of reliability and relevance of nonstatutory aggravating factors when it so carefully defined the statutory aggravating factors and, in so doing, confined them to a strikingly high level of relevance and reliability. Indeed, to relax the standards for nonstatutory aggravating factors "would defeat the goal of guided and measurable jury discretion, and return us to an unconstitutional system where the death penalty is 'wantonly' and 'freakishly' imposed." *Davis,* 912 F.Supp. at 943.

Factor 10 alleges what is, without doubt, quite serious conduct. Nonetheless, unlike those statutory aggravating factors which rely upon a defendant's criminal history, Factor 10 is not based on a conviction arising out of the conduct alleged to comprise the aggravating factor. That is not to say that a nonstatutory aggravating factor must always be based on an antecedent criminal conviction. *See United States v. Davis,* 912 F.Supp. at 948 n. 25. The unadjudicated conduct referred to in Factor 10, however, does not even describe a crime.

Construed favorably to the United States, Factor 10, as augmented by the proffer, might be considered a conspiratorial agreement. Nonetheless, neither Factor 10, nor the proffer made to support it, demonstrate that the discussion was accompanied by an overt act, which, of course, is necessary to convert an agreement to accomplish a criminal purpose into a crime. The United States has cited, and the Court has found, no decision which has permitted unadjudicated misconduct not itself a crime to constitute a freestanding, nonstatutory aggravating factor.

---

**8.** 18 U.S.C. § 3592(c)(1), (5) through (9), (11), (13), (14) and (16).

**9.** 18 U.S.C. § 3592(c)(2), (3), (4), (10), (12) and (15).

Although the conduct alleged in Factor 10 is serious, and might otherwise be admissible in evidence, it is not of sufficient relevance and reliability to assume the important role of an aggravating factor which, if proven, may be weighed as a factor to determine whether death is an appropriate penalty. Having measured the relevance and reliability of nonstatutory aggravating Factor 10 against the statutory aggravating factors and having considered it in perspective of the Supreme Court's death penalty jurisprudence, and having found it to be lacking in those important qualifying components, it is necessary to consider the arguments made in support of Factor 10 by the United States.

First, the United States contends that there is a "tremendous difference between a criminal who (1) admits his guilt, (2) simply contests his guilt, and (3) obstructs justice in an effort to avoid responsibility for his acts." Gov't Response at 11. That proposition, of course, is true in the abstract, but it is well to remember that Factor 10 contains no allegation that Eugene or Travis Friend in fact obstructed justice, nor does the proffer made in support of Factor 10.

Second, the United States notes that Congress and the Sentencing Commission have decided that those who seek to obstruct justice are subject to additional punishment, as reflected in 18 U.S.C. § 1503 and § 3C1.1 of the Federal Sentencing Guidelines. *See id.* That proposition too is true insofar as obstruction of justice is a relevant consideration under the Sentencing Guidelines and, if shown, obstruction of justice may result in a longer sentence than would otherwise obtain. The point in a capital sentencing, however, is not that any fact which makes a capital defendant more morally blameworthy, or even deserving of more punishment, thereby qualifies as an aggravating factor to be considered in the weighing aspect of death penalty selection. Nor can the United States plausibly suggest that obstruction of justice based on conduct not resulting in a homicide would ever subject a defendant to a punishment as severe and final as is

death. The more relaxed application of the obstruction of justice enhancement under the Sentencing Guidelines is inconsistent with the principles which inform death penalty jurisprudence.

In sum, Factor 10 does not meet the relevance and heightened reliability components required to assume the significant role played by a nonstatutory factor under the FDPA and the Supreme Court's death penalty jurisprudence.

## CONCLUSION

For the foregoing reasons, the Motion to Strike Nonstatutory Aggravating Factor No. 10 is GRANTED. Co-defendant Travis McKinnley Friend has not moved to strike the identically-worded nonstatutory aggravating factor 12 in the Government's Notice of Intent to Seek a Sentence of Death against him; however, the United States shall have ten (10) days from the filing of this Memorandum Opinion to show cause why nonstatutory aggravating factor 12 in *United States v. Travis McKinnley Friend* should not also be stricken.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.