UNITED STATES of America,

v.

Usama BIN LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "Abdul Hay," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," a/k/a "the Contractor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," a/k/a "Abu Khadija," Ayman Al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a "Abu Mohammed," a/k/a "Abu Mohammed Nur al-Deen," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled Al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed, a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah al Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," a/k/a "the Manager," a/k/a "Tanzanite," Ibrahim Eidarous, a/k/a "Ibrahim Hussein Abdelhadi Eidarous," a/k/a "Daoud," a/k/a "Abu Abdullah," a/k/a "Ibrahim," Adel Abdel Bary, a/k/a "Adel Mohammed Abdul Almagid Abdel Bary," a/k/a "Abbas," a/k/a "Abu Dia," a/k/a "Adel," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdullah," a/k/a "Fazhl Khan," Mohamed Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a "Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mba- rak Assayid," Mohamed Rashed Daoud Al-'Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," a/k/a "Khalid," a/k/a "Abu Jihad," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khalfan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

No. S(7) 98 CR. 1023(LBS).

United States District Court,
S.D. New York.

Dec. 11, 2000.

Mary Jo White, United States Attorney for the Southern District of New York, Paul W. Butler, Patrick J. Fitzgerald, Kenneth M. Karas, Michael J. Garcia, Paul W. Butler, Andrew C. McCarthy, Assistant United States Attorneys, New York City, for U.S.

Frederick H. Cohn, Laura Gasiorowski, David Preston Baugh, NY, for Defendant Al-'Owhali.

David A. Ruhnke, Jeremy Schneider, David Stern, NY, for Defendant Khalfan Khamis Mohamed.

Sam A. Schmidt, Joshua L. Dratel, Kristian K. Larsen, New York City, for Defendant El Hage.

Anthony L. Ricco, Edward D. Wilford, Carl J. Herman, Sandra A. Babcock, NY, for Defendant Odeh.

## *OPINION*

SAND, District Judge.

If ultimately convicted for their alleged roles in the August 1998 bombings of two U.S. embassies in East Africa, Defendants Khalfan Khamis Mohamed ("K.K.Mohamed") and Mohamed Rashed Daoud Al-'Owhali ("Al-'Owhali") face possible death sentences. These two defendants have moved jointly to dismiss the Government's death penalty notices against them on grounds that the federal death penalty is sought "on the impermissible basis of race, and the arbitrary and capricious basis of geography." (Br. in Supp. of K.K. Mohamed's Death Penalty Mots. at 29.) In lieu of dismissal, Defendants seek expansive discovery of the Government's "capital-charging practices in [their own] and other capital cases" dating from January 1995[1] to the present. (Reply Br. in Supp. of K.K. Mohamed's Death Penalty Mots. at 2.) The sole evidence proffered by Defendants in support of their motion is the *1988–2000 Survey of the Federal Death Penalty System*, a statistical study internally conducted and recently released by the U.S. Department of Justice ("the DOJ Survey"). Because we conclude that the DOJ Survey—in and of itself—does not justify, in the context of this specific capital prosecution, either dismissal of the death penalty notices or court-mandated discovery, Defendants' joint motion is de-

---

1. Defendants' discovery request actually asks for material related to "all cases submitted to the Attorney General's Review Committee on Capital Cases between January 1, 1994 and the present." (Reply Br. in Supp. of K.K. Mohamed's Death Penalty Mots. at 8.) How-

ever, the Review Committee was not even established until January 1995. (DOJ Survey at 5.) We therefore treat Defendants' discovery request, for the purposes of this motion, as if it were textually limited to the period between January 1995 and the present.

nied.[2]

## I. THE DOJ SURVEY

Released publicly on September 12, 2000, the DOJ Survey presents statistical data on the racial and geographic distribution of defendants at various stages of the federal capital-approval process. The coverage dates of the DOJ Survey are from November 18, 1988 (when the Drug Kingpin Act effectively reinstated the federal death penalty) to July 20, 2000. Rather than paraphrase the entirety of this 417-page study, we summarize *infra* those findings most relevant to Defendants' motion. In particular, because Defendants limit their request for discovery to federal capital cases between January 1995 and the present, we focus our synopsis on the post–1994 elements of the DOJ Survey.

Since January 1995, there have existed four major steps in the federal capital-approval process. First, a U.S. Attorney must initially decide whether to charge a defendant within his jurisdiction with a capital-eligible offense. Second, all 94 U.S. Attorneys must submit for DOJ review any case involving a capital-eligible defendant, and include with such submission their recommendation on whether to seek the death penalty against that defendant. Third, every submission is then considered by the Attorney General's Review Committee on Capital Cases ("Review Committee) which makes its own independent recommendation on whether to seek the death penalty. Fourth, the Attorney General evaluates all the capital-eligible cases submitted by the U.S. Attorneys, along with the two accompanying recommendations, and issues final direction on whether to seek the death penalty against each defendant.[3]

Each of these four steps necessarily requires the relevant decision-maker to divide defendants into two groups: those who should face the federal death penalty and those who should not. The DOJ Survey quantitatively analyzes that discretionary choice historically and through the lens of defendants' race and geographic location.

### A. RACE STATISTICS

To some degree, the racial statistics presented in the DOJ Survey are indeed troubling. At each constituent level of decision-making in the federal capital-approval process—U.S. Attorney, Review Committee, Attorney General—more blacks (always) and Hispanics (sometimes) are selected to face the death penalty than whites. For example:

- From January 1995 to July 2000, of those defendants charged with a capital-eligible offense by the U.S. Attorney for the Southern District of New York, 8 percent were white; 34 percent were black; 56 percent were Hispanic; and 2 percent were "other race."[4] (DOJ Survey at T–16.)

- From January 1995 to July 2000, of those defendants charged with a capital-eligible offense by the 94 U.S. Attorneys (as a whole), 20 percent were white; 48 percent were black; 29 percent were

---

**2.** K.K. Mohamed and Al-'Owhali have made numerous other motions (both jointly and individually) regarding the federal death penalty besides the one discussed in this Opinion—e.g., moving that the Federal Death Penalty Act is unconstitutional on its face; and moving that certain aggravating factors contained in the Government's death penalty notices must be stricken. We will rule on all of Defendants' remaining death penalty motions in a separate, forthcoming decision.

**3.** By way of background, between November 1988 and January 1995, DOJ policy governing the capital-approval process only required that U.S. Attorneys receive Attorney General authorization in those cases in which they affirmatively wished to seek the death penalty; there existed no Review Committee as of yet. Thus, the decision not to seek the death penalty was, in the first instance, left to the presiding U.S. Attorney's discretion. (*Id.*)

**4.** This category includes "any person whose race is Asian, Pacific Islander, Native American, Aleut, Indian, or unknown." (*Id.* at 6 n. 5.)

Hispanic; and 4 percent were "other race." (*Id.* at 9.)

- From January 1995 to July 2000, of those recommendations to seek the death penalty made by the U.S. Attorney for the Southern District of New York, 17 percent involved white defendants; 83 percent involved black defendants; 0 percent involved Hispanic defendants; and 0 percent involved "other race" defendants. (*Id.* at T–16.)

- From January 1995 to July 2000, of those recommendations to seek the death penalty made by the 94 U.S. Attorneys (as a whole), 26 percent involved white defendants; 44 percent involved black defendants; 21 percent involved Hispanic defendants; and 8 percent involved "other race" defendants. (*Id.* at 14.)

- From January 1995 to July 2000, of those recommendations to seek the death penalty made by the Review Committee, 26 percent involved white defendants; 44 percent involved black defendants; 23 percent involved Hispanic defendants; and 7 percent involved "other race" defendants. (*Id.* at 22.)

- From January 1995 to July 2000, of those authorizations to seek the death penalty made by the Attorney General, 28 percent involved white defendants; 45 percent involved black defendants; 20 percent involved Hispanic defendants; and 8 percent involved "other race" defendants. (*Id.* at 27.)

Yet the above figures fail to account for the fact that, at each level of decision-making, the pool of federal defendants eligible for capital approval may be filled with differing numbers of a given racial group. Perhaps the reason why, between January 1995 and July 2000, the Attorney General authorized seeking the death penalty against more blacks than whites can be explained by the fact that more blacks were capital-eligible to begin with.[5] Not surprisingly, the DOJ Survey additionally compares the relative rates of capital ap-

proval within each racial group and at each decision-making step. The resulting statistics are far less startling:

- From January 1995 to July 2000, the U.S. Attorney for the Southern District of New York recommended seeking the death penalty against 25 percent of the white defendants charged with capital-eligible offenses; against 29 percent of the black defendants charged with capital-eligible offenses; against 0 percent of the Hispanic defendants charged with capital-eligible offenses; and against 0 percent of the "other race" defendants charged with capital-eligible offenses. (*Id.* at T–16.)

- From January 1995 to July 2000, the 94 U.S. Attorneys (as a whole) recommended seeking the death penalty against 36 percent of the white defendants charged with capital-eligible offenses; against 25 percent of the black defendants charged with capital-eligible offenses; against 20 percent of the Hispanic defendants charged with capital-eligible offenses; and against 52 percent of the "other race" defendants charged with capital-eligible offenses. (*Id.* at 10.)

- From January 1995 to July 2000, the Review Committee recommended seeking the death penalty against 40 percent of the white defendants under consideration; against 27 percent of the black defendants under consideration; against 25 percent of the. Hispanic defendants under consideration; and against 50 percent of the "other race" defendants under consideration. (*Id.*)

- From January 1995 to July 2000, the Attorney General authorized seeking the death penalty against 38 percent of the white defendants under consideration; against 25 percent of the black defendants under consideration; against 20 percent of the Hispanic defendants under consideration; and against 46 percent of the "other race" defendants under consideration. (*Id.*)

**5.** This, of course, raises a further question: are minorities being charged by U.S. Attorneys with capital-eligible offenses at greater rates than whites who commit similarly culpable conduct? The DOJ Survey does not address this issue.

As is apparent from this last set of statistics, black and Hispanic defendants who are capital-eligible are actually being approved for the federal death penalty at lesser rates than their white counterparts.[6]

## B.  GEOGRAPHY STATISTICS

The DOJ Survey also suggests that a federal defendant's likelihood of facing the death penalty depends to some degree on the particular jurisdiction to which he is subject.  In other words, rates of capital-approval are not uniform across all 94 U.S. Attorneys.  None of the figures relating to geographic distribution, however, controls for the level of criminal activity underlying defendants' indictments, of for contextual differences among the various federal districts.

- From January 1995 to July 2000, 21 of the 94 U.S. Attorneys never charged a defendant with a capital-eligible offense.  (*Id.* at 15.)
- From January 1995 to July 2000, of the 72 U.S. Attorneys that charged at least one defendant with a capital-eligible offense, 23 never recommended that the death penalty be sought.  (*Id.*)
- From January 1995 to July 2000, the 38 U.S. Attorneys that recommended that the death penalty be sought against more than one defendant did so at differing rates.  For example, the U.S. Attorney for the Southern District of New York recommended that the death penalty be sought against 12 percent of that district's capital-eligible defendants, whereas that same figure for the U.S. Attorney for the Eastern District of Virginia was 32 percent.  (*Id.* at T–16,T–17.)

## II.  DISCUSSION

## A.  RACIAL DISPARITY IN SEEKING THE FEDERAL DEATH PENALTY

Defendants argue that the statistical findings of the DOJ Survey establish a prima facie case that the federal death penalty is disproportionately applied to minority defendants in violation of the equal protection guarantee embodied in the Fifth Amendment.    Furthermore,  should  we find that a prima facie case has not been shown, Defendants contend in the alternative that the DOJ Survey alone is still sufficient to warrant discovery into the Government's capital-approval practices. We reject both of these claims.

### 1.  *Prima Facie Proof of Discriminatory Intent*

Any discussion on the subject of statistics, race, and the death penalty must begin with the U.S. Supreme Court's decision in *McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).  After first noting that a defendant who alleges an equal protection violation has the burden of proving both discriminatory intent and discriminatory effect, the Court focused on the evidentiary showing necessary to satisfy the intent prong of the analysis.  (*Id.* at 292–293, 107 S.Ct. 1756.) The Court held that, above all, a defendant had to demonstrate that "the decisionmakers in his case acted with discriminatory purpose."  (*Id.* at 292, 107 S.Ct. 1756.)  It was the Court's conclusion that such a showing could not be met by systemic statistics alone—that is, discriminatory intent in a particular prosecution could not conclusively be inferred from system-wide findings suggestive of racially disparate impact.  (*Id.* at 297, 107 S.Ct. 1756.)  This is because aggregate statistics measuring the total sentencing outputs of a whole death penalty system (e.g., the state of Georgia) encapsulate so many decisionmaking entities (e.g., countless numbers of prosecutorial agencies and jury panels), each of which makes its own subjective determinations, that distillation of individualized intent would be constitutionally un-

---

6.  The higher capital-approval percentages for "other race" defendants are caused by the low number of such defendants within the federal capital system.

sound. (*Id.* at 294, 107 S.Ct. 1756.) At its core, therefore, *McCleskey* stands for the notion that, by themselves, systemic statistics cannot prove racially discriminatory intent in support of an equal protection claim by a particular capital defendant.

On the other hand, *McCleskey* is silent on whether an *individualized* statistical study should be treated as skeptically as a systemic one. It is not entirely clear, after all, that racially disproportionate figures with respect to a single prosecutor's capital-charging decisions should not afford a more legitimate basis for an inference of discriminatory intent. (*See generally* John H. Blume, Theodore Eisenberg & Sheri Lynn Johnson, "Post-*McCleskey* Racial Discrimination Claims in Capital Cases," 83 *Cornell L.Rev.* 1771 (Sept.1998).) This practical distinction is at issue here because the DOJ Survey offers both systemic and individualized figures. Indeed, although the capital-approval decisions of all 94 U.S. Attorneys are analyzed in the aggregate, individualized statistics are provided with respect to the U.S. Attorney for the Southern District of New York, the Review Committee, and the Attorney General—all three of whom play some role in the decision to charge K.K. Mohamed and Al-'Owhali with the death penalty in this case.

We need not rule, however, on the relationship in death penalty cases between individualized statistical evidence and proof of discriminatory intent. This is because we conclude that the second prong of Defendants' equal protection claim—prima facie proof of discriminatory effect—has not been met.

### 2. *Prima Facie Proof of Discriminatory Effect*

In equal protection cases, the formulaic description of what is necessary to prove discriminatory effect is that the proffered evidence must show that similarly situated individuals of a different race were treated differently. (*See U.S. v. Armstrong*, 517 U.S. 456, 466, 116 S.Ct. 1480, 134 L.Ed.2d 687 (1996).) Here, Defendants are required to establish that at least one of the decision-makers in their case (the U.S. Attorney for the Southern District of New York, the Review Committee, or the Attorney General) has systematically declined to capitally prosecute non-African-Arabic[7] defendants accused of illicit activity comparable to those alleged to have been committed by Defendants—that is, a mass terrorist bombing.[8]

Given the extraordinariness of crimes of this magnitude (at least 214 persons killed), the DOJ Survey predictably presents no qualifying evidence of disparate impact against Defendants. Indeed, it is the Court's understanding that the only other federal defendants similarly situated to K.K. Mohamed and Al-'Owhali are the two men convicted for the 1995 Oklahoma City bombing; Timothy McVeigh and Terry Nichols.[9] And like K.K. Mohamed and Al-'Owhali, McVeigh and Nichols—who are

---

7. Only Defendant K.K. Mohamed has affirmatively asserted African–Arabic heritage. (Br. in Supp. of K.K. Mohamed's Death Penalty Mots. at 38.) Defendant Al-'Owhali has not indicated to what racial/ethnic group he belongs. On the one hand, the DOJ Survey classifies Al-'Owhali as "white." (DOJ Survey at T–37.) On the other hand, Al-'Owhali now joins in a motion that accuses the federal death penalty of being applied disproportionately against minorities. We assume, for the purposes of this motion, that Al-'Owhali challenges the decision to prosecute him capitally from the status of a non-white defendant.

8. The Court rejects Defendants' contention that the relevant pool of similarly situated

individuals should be that of all capital-eligible federal defendants. Distinctions must be made with respect to the relative seriousness of the underlying offense.

9. These 4 defendants can be considered "comparable" because all were indicted under 18 U.S.C. 2332a(a)—use of certain weapons of mass destruction against nationals of the United States. (DOJ Survey at T–29.)

From January 1995 to July 2000, only two groups of defendants were ever charged under § 2332a(a): those associated with the East Africa embassy bombings and those associated with the Oklahoma City bombing. (*Id.*)

both white—went to trial facing the death penalty.[10]

Therefore, because we find that Defendants have fallen far short of their prima facie burden in proving discriminatory effect, we reject the claim that the Fifth Amendment requires dismissal of the Government's death penalty notices.[11]

### 3. Defendants' Request for Discovery

■ We now turn to Defendants' request in the alternative for discovery into the Government's "capital-charging practices in [their own] and other capital cases" dating from January 1995 to the present. (Reply Br. in Supp. of K.K. Mohamed's Death Penalty Mots. at 2.) The prevailing standard for discovery in a selective prosecution claim was set forth by the Supreme Court in *U.S. v. Armstrong:* A moving defendant must present " 'some evidence tending to show the existence of the essential elements of the [claim],' discriminatory effect and discriminatory intent." (517 U.S. at 468, 116 S.Ct. 1480 (quoting *U.S. v. Berrios,* 501 F.2d 1207, 1211 (2d Cir. 1974)).)

The "some evidence" formulation—though less stringent than that necessary to sustain a prima facie case of racial discrimination [12] (*see U.S. v. Jones,* 159 F.3d 969, 977 (6th Cir.1998); *see also U.S. v. Cooper,* 91 F.Supp.2d 90, 115 (D.D.C. 2000); *U.S. v. Roman,* 931 F.Supp. 960, 964–967 (D.R.I.1996))—is still rigorous relative to ordinary threshold standards for discovery. (*Armstrong,* 517 U.S. at 468, 116 S.Ct. 1480.) This is because, in the context of a selective prosecution claim, compelling "discovery ... imposes many of the costs present when the Government must respond to a prima facie case." (*Id.*) Indeed, there is a cognizable risk that forced discovery will "divert prosecutors' resources and ... disclose the Government's prosecutorial strategy." (*Id.*) The Court thus held in *Armstrong* that a defendant's request for discovery should only be granted if there is produced "some evidence that similarly situated defendants of other races could have been prosecuted, but were not." (*Id.* at 469, 116 S.Ct. 1480.) [13] Such a showing will not be an

---

**10.** McVeigh was sentenced to death, while Nichols faces life imprisonment. (*See generally U.S. v. Nichols,* 169 F.3d 1255 (10th Cir. 1999); *U.S. v. McVeigh,* 153 F.3d 1166 (10th Cir.1998).)

**11.** Defendants additionally argue that they have been subject to racial discrimination in violation of: (1) implicit rights contained within subsection 3593(f) of the Federal Death Penalty Act; (2) the International Convention on the Elimination of All Forms of Racial Discrimination; (3) and the International Covenant on Civil and Political Rights. (Br. in Supp. of K.K. Mohamed's Death Penalty Mots. at 43–45; Al-'Owhali's Mot. to Adopt K.K. Mohamed's Death Penalty Mots. at 1–4.) The remedy for such violations, submit Defendants, is dismissal of the Government's death penalty notices.

We do not address these three grounds for dismissal since, at bottom, Defendants have failed to demonstrate that they have in fact suffered discrimination on account of their race. As such, dismissal of the Governments' death notices is denied with respect to Defendants' non-constitutional claims as well.

**12.** There is a split in authority on this point. (*Compare U.S. v. Jones,* 159 F.3d 969, 977–

978 (6th Cir.1998), *with U.S. v. Webster,* 162 F.3d 308, 335 (5th Cir.1998) (noting that the standard for discovery in a selective prosecution claim is equal to that necessary to sustain a prima facie case).) We adopt the approach taken by *Jones* because we find that any logical reading of the Supreme Court's decision in *Armstrong* compels the conclusion that a requirement of "some evidence tending to show the existence of the [claim's] essential elements" (*Armstrong,* 517 U.S. at 468, 116 S.Ct. 1480) is qualitatively and quantitatively different from a requirement of evidence that affirmatively *proves* that claim to a prima facie degree. "Obviously, a defendant need not prove his case in order to justify discovery on an issue." (*Jones,* 159 F.3d at 978.)

Although the *Armstrong* Court observed that forcing the Government to provide discovery "imposes many of the costs present when the Government must respond to a prima facie case of selective prosecution" (517 U.S. at 468, 116 S.Ct. 1480), it did not say that such discovery imposed *identical* costs.

**13.** Of course, this proffer would only meet the discriminatory effect prong of the analysis; some evidence of discriminatory intent would

"insuperable task," the Court reasoned, if the defendant's claim of selective prosecution were at all well founded. (*Id.* at 470, 116 S.Ct. 1480.)

As we concluded in Subsection I.A.3., *supra*, K.K. Mohamed and Al-'Owhali have provided absolutely no evidence that, as capital-eligible federal defendants, they have been treated differently from persons of other races who are comparably situated. Nor does our review of the DOJ Survey affords such a finding. The Court therefore denies all of Defendants' discovery requests relating to the Government's capital-approval practices in this federal prosecution or others.

## B. GEOGRAPHIC ARBITRARINESS IN SEEKING THE FEDERAL DEATH PENALTY

Defendants contend that the Government imposes the federal death penalty on the "arbitrary and capricious basis of geography," thereby violating the Eight Amendment's ban against cruel and unusual punishments. Yet the sole evidence submitted in support of this broad claim— the DOJ Survey's limited geographical statistics—is flawed in several respects. First, the Survey cannot tell us the most meaningful information of all: whether individuals similarly situated to Defendants have not been capitally-prosecuted in other federal districts. Nor could such a showing be made since, as noted *supra*, Timothy McVeigh and Terry Nichols were both subject to the death penalty at trial.

Second, Defendants make this geographical challenge from within a federal jurisdiction where, between January 1995 and July 2000, the death penalty was sought against only 6 of 50 capital-eligible defendants (12 percent). (DOJ Survey at T–37.) In marked contrast are, for example, the counterpart figures from the Western District of Missouri (8 of 8; 100 percent), the Northern District of Texas (6 of 10; 60 percent), and the Eastern District of Virginia (21 of 66; 32 percent). (*Id.* at T–35, T–40, T–41.) It is therefore also be needed before discovery could be

not clear that Defendants are best situated to claim constitutional injury based on their relative geographical circumstance.

And third, for the aggregate statistical disparities in the DOJ Survey even to be relevant, a preliminary assumption must be made that capital-approval rates should be approximately equal across all 94 federal districts. But this is unrealistic given inevitable differences between districts in factors such as geographic size, population, demographic composition, and criminal density. It is eminently reasonable to be of the view that some districts will of course encounter greater instances of illicit conduct meeting federal capital-eligibility criteria.

At most, the DOJ Survey indicates that the 94 U.S. Attorneys in this nation exercise their capital-approval discretion unevenly. The Supreme Court declared in *McCleskey*, however, that "[a]pparent disparities ... are an inevitable part of our criminal justice system" and "where the discretion that is fundamental to our criminal process is involved, [courts should] decline to assume that what is unexplained is invidious." (481 U.S. at 312–313, 107 S.Ct. 1756.) Accordingly, because Defendants have not shown a constitutionally unacceptable risk that geography plays an inappropriate role in federal capital decision-making with respect to this particular prosecution, we reject Defendants' Eighth Amendment claim that the Government's death penalty notices should be dismissed.

## III. CONCLUSION

For all of the foregoing reasons, we deny Defendants' joint motion to dismiss the Government's death penalty notices and, in the alternative, to compel discovery relating to the Government's capital-approval practices.

SO ORDERED.

granted.