UNITED STATES of America,

v.

Usama BIN LADEN, a/k/a "Usamah Bin–Muhammad Bin–Ladin," a/k/a "Shaykh Usamah Bin–Ladin," a/k/a "Abu Abdullah," a/k/a "Mujahid Shaykh," a/k/a "Hajj," a/k/a "Abdul Hay," a/k/a "al Qaqa," a/k/a "the Director," a/k/a "the Supervisor," a/k/a "the Contractor," Muhammad Atef, a/k/a "Abu Hafs," a/k/a "Abu Hafs el Masry," a/k/a "Abu Hafs el Masry el Khabir," a/k/a "Taysir," a/k/a "Sheikh Taysir Abdullah," a/k/a "Abu Fatimah," a/k/a "Abu Khadija," Ayman al Zawahiri, a/k/a "Abdel Muaz," a/k/a "Dr. Ayman al Zawahiri," a/k/a "the Doctor," a/k/a "Nur," a/k/a "Ustaz," a/k/a "Abu Mohammed," a/k/a "Abu Mohammed Nur al-Deen," Mamdouh Mahmud Salim, a/k/a "Abu Hajer al Iraqi," a/k/a "Abu Hajer," Khaled al Fawwaz, a/k/a "Khaled Abdul Rahman Hamad al Fawwaz," a/k/a "Abu Omar," a/k/a "Hamad," Ali Mohamed, a/k/a "Ali Abdelseoud Mohamed," a/k/a "Abu Omar," a/k/a "Omar," a/k/a "Haydara," a/k/a "Taymour Ali Nasser," a/k/a "Ahmed Bahaa Eldin Mohamed Adam," Wadih El Hage, a/k/a "Abdus Sabbur," a/k/a "Abd al Sabbur," a/k/a "Wadia," a/k/a "Abu Abdullah al Lubnani," a/k/a "Norman," a/k/a "Wa'da Norman," a/k/a "the Manager," a/k/a "Tanzanite," Ibrahim Eidarous, a/k/a "Ibrahim Hussein Abdelhadi Eidarous," a/k/a "Daoud," a/k/a "Abu Abdullah," a/k/a "Ibrahim," Adel Abdel Bary, a/k/a "Adel Mohammed Abdul Almagid Abdel Bary," a/k/a "Abbas," a/k/a "Abu Dia," a/k/a "Adel," Fazul Abdullah Mohammed, a/k/a "Harun," a/k/a "Harun Fazhl," a/k/a "Fazhl Abdullah," a/k/a "Fazhl Khan," Mohamed Sadeek Odeh, a/k/a "Abu Moath," a/k/a "Noureldine," a/k/a "Marwan," a/k/a "Hydar," a/k/a "Abdullbast Awadah," a/k/a "Abdulbasit Awadh Mbarak Assayid," Mohamed Rashed Daoud Al-'Owhali, a/k/a "Khalid Salim Saleh Bin Rashed," a/k/a "Moath," a/k/a "Abdul Jabbar Ali Abdel–Latif," Mustafa Mohamed Fadhil, a/k/a "Mustafa Ali Elbishy," a/k/a "Hussein," a/k/a "Hussein Ali," a/k/a "Khalid," a/k/a "Abu Jihad," Khalfan Khamis Mohamed, a/k/a "Khalfan Khamis," Ahmed Khalfan Ghailani, a/k/a "Fupi," a/k/a "Abubakary Khalfan Ahmed Ghailani," a/k/a "Abubakar Khalfan Ahmed," Fahid Mohammed Ally Msalam, a/k/a "Fahad M. Ally," Sheikh Ahmed Salim Swedan, a/k/a "Sheikh Bahamadi," a/k/a "Ahmed Ally," Defendants.

No. S(7) 98 CR. 1023 (LBS).

United States District Court,
S.D. New York.

Jan. 2, 2001.

292

Mary Jo White, United States Attorney, Paul W. Butler, Patrick J. Fitzgerald, Kenneth M. Karas, Michael J. Garcia, Andrew C. McCarthy, Assistant United States Attorneys, New york City, for the Southern District of New York.

Frederick H. Cohn, Laura Gasiorowski, David Preston Baugh, New York City, for Defendant Al-'Owhali.

David A. Ruhnke, Jeremy Schneider, David Stern, New York City, for Defendant Khalfan Khamis Mohamed.

Sam A. Schmidt, Joshua L. Dratel, Kristian K. Larsen, New York City, for Defendant El Hage.

Anthony L. Ricco, Edward D. Wilford, Carl J. Herman, Sandra A. Babcock, New York City, for Defendant Odeh.

## OPINION

SAND, District Judge.

Defendants Khalfan Khamis Mohamed ("K.K.Mohamed") and Mohamed Rashed Daoud Al-'Owhali ("Al-'Owhali") make numerous challenges to the imposition of capital punishment in this case, the Federal Death Penalty Act ("FDPA"),[1] and various aspects of the Government's two death penalty notices. Defendants further move for a limited bill of particulars concerning the factual basis supporting two of the non-statutory aggravating factors that the Government seeks to prove at sentencing. Concurrently before the Court is a separate motion by the Government for leave to file an amended death penalty notice as to K.K. Mohamed.

For reasons set forth below, we: (1) order that, as to both Defendants, the non-statutory aggravating factor of "causing serious injury to surviving victims" be stricken from the Government's death penalty notices, and the non-statutory aggravating factor of "victim impact evidence" be amended to include any "injury, harm, and loss" suffered by victims and their families, whether the victims are deceased or surviving; (2) order that, as to both Defendants, the non-statutory aggravating factor of "disruption to important governmental functions" be stricken from the Government's death penalty notices; (3) order that, as to Defendant Al-'Owhali, the non-statutory aggravating factor of "knowledge of simultaneous acts of terrorism" not be stricken from the Government's death penalty notice at the present time; (4) order that the Government provide Defendants with a limited bill of particulars, as defined in Part V of this Opinion; and (5) grant the Government's motion for leave to file an amended death penalty notice as to K.K. Mohamed.

All of Defendants' other applications are denied, except that Defendants' remaining challenges to specific aggravating factors are denied without prejudice to renewal after conclusion of the liability phase and before commencement of the sentencing phase, at which time the Court—aided by a full evidentiary record and the jury's verdict—will be in a better position to re-examine some of the motions provisionally rejected herein. (*Cf. U.S. v. McVeigh*, 944 F.Supp. 1478, 1491 (D.Colo.1996) (opting to "await the evidence, [due at trial] before determining whether and to what extent a penalty phase jury will be allowed to consider [a disputed] factor").)

## I. THE DEATH PENALTY NOTICES

On June 27 and 28, 2000—pursuant to 18 U.S.C. § 3593(a)—the Government filed notices of intent to seek the death penalty against K.K. Mohamed and Al-'Owhali. It is the Government's belief that, given the circumstances of this case, a sentence of death will be justified if either of the Defendants is convicted for any of the following crimes charged in the seventh superseding indictment:

- destruction of U.S. property by means of an explosive resulting in death (18 U.S.C. § 844(f)(1) & (3))—one count for each Defendant;

- use of a weapon of mass destruction against U.S. nationals resulting in death (*id.* § 2332a(a))—one count for each Defendant;

- murder in the course of an attack on a federal facility involving the use of a deadly weapon (*id.* § 930(c))—11 counts for K.K. Mohamed, 213 counts for Al-'Owhali; and

- murder of U.S. employees engaged in official duties or of persons assisting U.S. employees so engaged (*id.* § 1114)—2 counts for K.K. Mohamed, 41 counts for Al-'Owhali.

Al-'Owhali alone is charged with two counts of an additional capital offense: murder of internationally protected persons (*id.* § 1116).

---

1. 18 U.S.C. § 3591 et seq.

Furthermore, as is required by 18 U.S.C. § 3593(a), the Government has set forth in its death penalty notices what aggravating factors it intends to prove at sentencing. With respect to each count of each of the capital offenses for which Defendants have been indicted, both Defendants are alleged to be subject to the following statutory aggravating factors:

- that the death occurred during the commission of another crime (*id.* § 3592(c)(1));
- that the defendant knowingly created a grave risk of death to additional persons (*id.* § 3592(c)(5));
- that the defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism (*id.* § 3592(c)(9)); and
- that the defendant intentionally killed or attempted to kill multiple persons (*id.* § 3592(c)(16)).

Both may also face the following non-statutory aggravating factors, again with respect to each count of each of the capital offenses for which Defendants have been indicted:

- that the defendant would be a continuing and serious threat to the lives and safety of others;
- that the defendant caused injury, harm, and loss to the victims and the victims' families;
- that the defendant caused serious injury to surviving victims;
- that the victim and intended victims included high-ranking public officials of the United States serving abroad; and
- that the defendant caused disruption to important governmental functions.

Finally, there is one non-statutory aggravating factor that the Government seeks to use against only Al-'Owhali: that the de-fendant had knowledge of simultaneous acts of terrorism. This aggravator is alleged with respect to each count of each of the five capital offenses for which Al-'Owhali has been indicted.

## II. CHALLENGES TO THE IMPOSITION OF CAPITAL PUNISHMENT

Defendants make four wide-ranging challenges to the imposition of capital punishment in this case, three of which we summarily reject.[2] The first—that the death penalty, under all circumstances, constitutes cruel and unusual punishment in violation of the Eighth Amendment—is an argument already foreclosed by the U.S. Supreme Court. (*Gregg v. Georgia*, 428 U.S. 153, 168–187, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).) The second—that international law completely bars this nation's use of the death penalty—is unsupportable since the United States is not party to any treaty that prohibits capital punishment per se, and since total abolishment of capital punishment has not yet risen to the level of customary international law. (*See Jamison v. Collins*, 100 F.Supp.2d 647, 766–767 (S.D.Ohio 2000); Amnesty International, *Abolitionist and Retentionist Countries* (last updated Nov. 23, 2000) <http:// www.web.amnesty.org/rmp/ dplibrary.nsf/index? openview> (reporting that, as of November 23, 2000, 87 nations around the world still retain capital punishment, while only 75 are fully abolitionist).) The third—that application of the death penalty to Defendants is "wholly arbitrary, in violation of article 6(1) of the [International Covenant on Civil and Political Rights]" (Br. in Supp. of K.K. Mohamed's Death Penalty Mots. at 110)—cannot meaningfully be evaluated given Defendants' failure even to allege, much less prove, that some inappropriate and arbitrary factor infected capital deci-

---

**2.** Defendants also request (Br. in Supp. of K.K. Mohamed's Death Penalty Mots. at 112) that we reconsider our Opinion of March 13, 2000 wherein we conclude that the (possible) application of the death penalty to Defendants Al-'Owhali, K.K. Mohamed, and Mohamed Sadeek Odeh did not violate due process concerns, including the rule of lenity (92 F.Supp.2d 189, 224–225 (S.D.N.Y.2000)). Because Defendants have not offered any new legal or factual grounds upon which to base such a reconsideration, we decline to do so.

sion-making with respect to this particular prosecution.[3]

■ Lastly, K.K. Mohamed moves to dismiss the Government's death penalty notice against him because, at the time of his arrest in South Africa, he was allegedly denied the right to consular notification pursuant to Article 36 of the Vienna Convention on Consular Relations ("the Vienna Convention").[4] (Apr. 24, 1963, 21 U.S.T. 77, T.I.A.S. No. 6820.) For purposes of this motion, we assume but do not decide that the Vienna Convention confers individual rights and that K.K. Mohamed was indeed denied those rights—a preliminary step taken by many courts that have recently analyzed this same issue. (*See U.S. v. Li*, 206 F.3d 56, 60 (1st Cir.2000); *U.S. v. Page*, 232 F.3d 536, 540 (6th Cir. 2000); *U.S. v. Lawal*, 231 F.3d 1045, 1047–48 (7th Cir.), *cert. denied*, — U.S. —, 121 S.Ct. 379, 148 L.Ed.2d 292 (2000); *U.S. v. Lombera–Camorlinga*, 206 F.3d 882, 885 (9th Cir.), *cert. denied*, — U.S. —, 121 S.Ct. 481, 148 L.Ed.2d 455 (2000); *U.S. v. Chanthadara*, 230 F.3d 1237, 1255 (10th Cir.2000); *U.S. v. Cordoba–Mosquera*, 212 F.3d 1194 (11th Cir. 2000); *U.S. v. Rodrigues*, 68 F.Supp.2d 178, 183 (E.D.N.Y.1999); *U.S. v. Salameh*, 54 F.Supp.2d 236, 279 (S.D.N.Y.1999); *U.S. v. Kevin*, 1999 WL 194749, *3 (S.D.N.Y.1999).) These two concessions notwithstanding, K.K. Mohamed's motion to dismiss is denied.

To begin, the Second Circuit has expressly "decline[d] to equate" the provisions of the Vienna Convention "with fundamental rights, such as the right to counsel, which traces its origins to concepts of due process." (*Waldron v. INS*, 17 F.3d 511, 518 (2d Cir.), *cert. denied*, 513 U.S. 1014, 115 S.Ct. 572, 130 L.Ed.2d 489 (1994); *see also Li*, 206 F.3d at 61; *Murphy v. Netherland*, 116 F.3d 97, 100 (4th Cir.), *cert. denied*, 521 U.S. 1144, 118 S.Ct. 26, 138 L.Ed.2d 1050 (1997); *Page*, 232 F.3d at 541; *Rodrigues*, 68 F.Supp.2d at 185; *Polanco v. U.S.*, 2000 WL 1072303, *6 (S.D.N.Y.2000); *Kevin*, 1999 WL 194749 at *3–4.) And since only a non-fundamental right can be said to have been violated, if at all, a showing that K.K. Mohamed suffered resulting prejudice is a prerequisite to any judicial relief cognizable under the Vienna Convention. (*See Netherland*, 116 F.3d at 100–101; *Chanthadara*, 230 F.3d at 1256; *Rodrigues*, 68 F.Supp.2d at 183–184; *Polanco*, 2000 WL 1072303 at *7; *Hurtado v. U.S.*, 2000 WL 890189, *5 (S.D.N.Y.2000); *Salameh*, 54 F.Supp.2d at 280; *Kevin*, 1999 WL 194749 at *4.) K.K. Mohamed has made no such showing of prejudice; he does not even attempt to explain how this capital prosecution., including the Government's decision to seek the death penalty against him, would likely have proceeded differently had his right to consular notification been honored at the time of his arrest abroad.[5]

■ Moreover, even were we to find that prejudice resulted, we are not convinced that the remedy K.K. Mohamed seeks is appropriate to redress a violation of the Vienna Convention. K.K. Mohamed has not provided us with any relevant authority which supports imposing the extraordinary remedy of dismissing the Government's death penalty notice, thereby

---

**3.** To the extent that the arbitrary factor is alleged to be race or geography, our Opinion of December 11, 2000 is dispositive of that claim. (2000 WL 1838754 (S.D.N.Y.2000).) For any other factor, the threshold showing must be that similarly situated individuals were treated differently from Defendants.

**4.** Al-'Owhali has concurrently raised a suppression motion based, inter alia, on a putative violation of the Vienna Convention. We will address the merits of his consular claim in a forthcoming opinion.

**5.** It bears noting that K.K. Mohamed was apprised of his consular rights as soon as he arrived in the United States from South Africa. (Gov't Memo. in Response to Defs.' Death Penalty Mots. at 70 n.27.) Thus, any prejudice that might have occurred is limited to events occurring post-arrest in South Africa.

rendering K.K. Mohamed effectively immune to capital punishment. The treaty itself provides for no such relief. Significantly, all courts that have considered the issue have already found evidentiary suppression—a far less drastic remedy—to be outside proper judicial authority with respect to consular notification claims. (*See, e.g., Li,* 206 F.3d at 62; *Page,* 232 F.3d at 540–541; *Lawal,* 231 F.3d 1045, 1047–48; *Lombera–Camorlinga,* 206 F.3d at 885–888; *Rodrigues,* 68 F.Supp.2d at 184–188; *Salameh,* 54 F.Supp.2d at 279.) And given that any defendant rights at issue here are non-fundamental and that the Government has its own valid interest to vindicate by pursuing the death penalty against K.K. Mohamed, we have no alternative but to conclude that dismissal of the Government's death penalty notice is not a remedy that may be imposed by the Court for violations of the Vienna Convention.

**6.** *See U.S. v. McVeigh,* 153 F.3d 1166, 1194–95 (10th Cir.1998), *cert. denied,* 526 U.S. 1007, 119 S.Ct. 1148, 143 L.Ed.2d 215 (1999); *U.S. v. Kaczynski,* 1997 WL 716487, *2–4 (E.D.Cal.1997); *U.S. v. Johnson,* 1997 WL 534163, *5 (N.D.Ill.1997); *U.S. v. Nguyen,* 928 F.Supp. 1525, 1545–46 (D.Kan. 1996); *U.S. v. Frank,* 8 F.Supp.2d 253, 281–282 (S.D.N.Y.1998). Although these decisions all precede *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (June 26, 2000), we find that *Apprendi* does nothing to alter our above conclusion that, in federal capital cases, gateway mental states and aggravators are not required to be contained in the indictment. (*See U.S. v. Kee,* 2000 WL 863119, *10 n. 9 (S.D.N.Y. June 27, 2000).) First, the *Apprendi* Court specifically noted that it was not addressing "a constitutional claim based on the omission of any reference to sentence enhancement ... in the indictment." (*Apprendi,* 120 S. Ct at 2356 n. 3.) Second, the Court made clear that a "sentencing factor"—i.e., "a circumstance, which may be either aggravating or mitigating in character, that supports a specific sentence within the range authorized by the jury's finding that the defendant is guilty of a particular offense"—was distinct from a "sentence enhancement," and that only the latter "fits squarely within the usual definition of an 'element' of the offense." (*Id.* at 2365 n. 19.) Third, the Court expressly stated that:

[T]his Court has previously considered and rejected the argument that the principles

## III. Facial Statutory Challenges

 Defendants submit seven facial challenges to the FDPA. (Br. in Supp. of K.K. Mohamed's Death Penalty Mots. at 51–65, 79–116.) All of these attacks have heretofore been subject to thorough analyses and rejection by other courts. Because we share in the reasoning offered in these various decisions, we see no need to engage in a reiteration simply for the sake of doing so. Therefore, we conclude that: (1) gateway mental states and aggravating factors are not elements of the indicted capital offenses such that grand jury findings are needed; [6] (2) the statutory factor of "substantial planning and premeditation" is not unconstitutionally vague; [7] (3) the FDPA authorizes the use of non-statutory aggravating factors; [8] (4) a federal prosecutor's ability to define non-statutory aggravating factors is not an impermissible

guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death.

(*Id.* at 2366.) Finally, with respect to Defendants in particular, we point out that the seventh superseding indictment already alleges that death resulted from the commission of all 5 offenses for which the Government seeks the death penalty, and that in such circumstances the maximum sentence allowable under these 5 statutes is capital punishment.

**7.** *See U.S. v. McCullah,* 76 F.3d 1087, 1110 (10th Cir.1996), *cert. denied,* 520 U.S. 1213, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997); *Kaczynski,* 1997 WL 716487 at *25–26; *McVeigh,* 944 F.Supp. at 1490; *Johnson,* 1997 WL 534163 at *4; *U.S. v. Glover,* 43 F.Supp.2d 1217, 1225–26 (D.Kan.1999); *U.S. v. Davis,* 904 F.Supp. 554, 558 (E.D.La.1995); *U.S. v. Spivey,* 958 F.Supp. 1523, 1531 (D.N.M.1997); *Frank,* 8 F.Supp.2d at 278.

**8.** *See Kaczynski,* 1997 WL 716487 at *4–5; *McVeigh,* 944 F.Supp. at 1485–56; *U.S. v. Cooper,* 91 F.Supp.2d 90, 95–97 (D.D.C.2000); *Glover,* 43 F.Supp.2d at 1228–29; *Nguyen,* 928 F.Supp. at 1536; *U.S. v. Cuff,* 38 F.Supp.2d 282, 287–288 (S.D.N.Y.1999); *Frank,* 8 F.Supp.2d at 261–266.

delegation of congressional power;[9] (5) proportionality review is not a mandatory component of a "weighing" death penalty scheme that utilizes non-statutory aggravating factors;[10] (6) the evidentiary standard available at the sentencing phase is not unconstitutional;[11] and (7) the FDPA does not remove plain error doctrine from the scope of appellate review.[12] All of Defendants' facial challenges to the FDPA are denied.

## IV. Specific Challenges To The Death Penalty Notices

■ As a preface to this part of our Opinion, we briefly review the sentencing roles served by statutory and non-statutory aggravating factors under the FDPA. The Supreme Court has held that, "[t]o pass constitutional muster, a capital sentencing scheme must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" (*Lowenfield v. Phelps*, 484 U.S. 231, 244, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988) (quoting *Zant v. Stephens*, 462 U.S. 862, 877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983)).) As enacted, the FDPA fulfills both these constitutionally-mandated criteria.

First, because Congress has opted to define capital offenses broadly, the requisite narrowing of death-eligible defendants occurs at the penalty phase of the case. It is then that a jury must unanimously find, beyond a reasonable doubt, that the defendant: (1) acted with one of four statutorily-prescribed gateway mental states, and (2) has engaged in conduct that falls within at least one statutorily-prescribed aggravating factor. Only after these two jury findings are made is the narrowing required by *Zant* and *Lowenfield* satisfied such that capital punishment may properly be imposed, if at all. Not surprisingly, this step in the FDPA process is known as the "eligibility phase."

■ Second, even within this narrowed class of capital defendants, particularized sentencing "based on the character of the individual and the circumstances of the crime" must still take place. (*Zant*, 462 U.S. at 878, 103 S.Ct. 2733.) To assist the penalty-stage jurors in distinguishing between those who deserve to be executed and those who do not, the FDPA asks them to "consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist." (18 U.S.C. § 3593(e).) This balancing analysis—called the "selection phase"—best achieves its intended function when all relevant information is available for candid consideration, whether it be in the form of a statutorily-prescribed aggravator, a proposed non-statutory aggravator, or any proffered evidence of mitigation.

9. *See U.S. v. Jones*, 132 F.3d 232, 239–240 (5th Cir.1998); *U.S. v. Paul*, 217 F.3d 989, 1003 (8th Cir.2000); *McCullah*, 76 F.3d at 1106–07; *Kaczynski*, 1997 WL 716487 at *5–6; *McVeigh*, 944 F.Supp. at 1486; *Cooper*, 91 F.Supp.2d at 100 n. 5; *Johnson*, 1997 WL 534163 at *4; *Glover*, 43 F.Supp.2d at 1229; *Nguyen*, 928 F.Supp. at 1536–37; *Davis*, 904 F.Supp. at 558–559; *U.S. v. Pitera*, 795 F.Supp. 546, 560 (E.D.N.Y.1992); *Cuff*, 38 F.Supp.2d at 287–288; *Frank*, 8 F.Supp.2d at 266–267; *Spivey*, 958 F.Supp. at 1531–33.

10. *See Jones*, 132 F.3d at 240–241; *Kaczynski*, 1997 WL 716487 at *13–14; *McVeigh*, 944 F.Supp. at 1486–87; *Cooper*, 91 F.Supp.2d at 99; *Johnson*, 1997 WL 534163 at *5; *Glover*, 43 F.Supp.2d at 1230–31; *Nguyen*, 928 F.Supp. at 1537; *Pitera*, 795 F.Supp. at 559–560; *Frank*, 8 F.Supp.2d at 272–273; *Spivey*, 958 F.Supp. at 1533.

11. *See Jones*, 132 F.3d at 241–242; *Kaczynski*, 1997 WL 716487 at *7–9; *McVeigh*, 944 F.Supp. at 1487; *Cooper*, 91 F.Supp.2d at 97–98; *Nguyen*, 928 F.Supp. at 1546–47; *Davis*, 904 F.Supp. at 560–562; *Pitera*, 795 F.Supp. at 564–566; *Frank*, 8 F.Supp.2d at 267–270; *Spivey*, 958 F.Supp. at 1529–30.

12. *See Kaczynski*, 1997 WL 716487 at *15–17; *McVeigh*, 944 F.Supp. at 1485; *Cooper*, 91 F.Supp.2d at 99; *Nguyen*, 928 F.Supp. at 1548; *Frank*, 8 F.Supp.2d at 270–272.

■ There remain, of course, limits to what information may be submitted during the penalty stage. For purposes of this motion, we focus our discussion on what ordinarily constitutes an improper aggravating factor, statutory or non-statutory. (*See Jones v. U.S.*, 527 U.S. 373, 398, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) ("[T]he weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor." (citing *Stringer v. Black*, 503 U.S. 222, 232, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992))).) First, the aggravator must not be so vague as to lack "some common-sense core meaning . . . that criminal juries [are] capable of understanding." (*Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).) Second, the aggravator cannot be overbroad such that a sentencing juror "fairly could conclude that [the] aggravating circumstance applies to every defendant eligible for the death penalty." (*Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 123 L.Ed.2d 188 (1993).) Third, the aggravator must be "sufficiently relevant to the question of who should live and who should die." (*U.S. v. Davis*, 912 F.Supp. 938, 943 (E.D.La.1996); *see Arave*, 507 U.S. at 474, 113 S.Ct. 1534; *U.S. v. Cuff*, 38 F.Supp.2d 282, 288–289 (S.D.N.Y.1999) ("A predicate to fulfilling the constitutional conditions for an aggravating factor is that the disputed factor be an aggravating factor in the first place."); *U.S. v. Friend*, 92 F.Supp.2d 534, 541 (E.D.Va.2000).) Fourth, even if relevant, the aggravator may be excluded "if its probative value is outweighed by the danger of creating unfair prejudice, confusing

the issues, or misleading the jury." (18 U.S.C. § 3593(c); *see also Friend*, 92 F.Supp.2d at 541 (deeming it "essential that an aggravating factor be measured in perspective of the fundamental requirement of heightened reliability").)

Less commonly, some courts have invalidated an aggravating factor that, although non-identical, is "necessarily subsumed" by another the problem being one of impermissible duplication. (*See U.S. v. McCullah*, 76 F.3d 1087, 1111–12 (10th Cir.1996), *cert. denied*, 520 U.S. 1213, 117 S.Ct. 1699, 137 L.Ed.2d 825 (1997); *U.S. v. Glover*, 43 F.Supp.2d 1217, 1221–22 (D.Kan.1999); *U.S. v. Chanthadara*, 928 F.Supp. 1055, 1058–59 (D.Kan.1996).) Still other courts, including a recent four-Justice plurality in *Jones v. United States*,[13] 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999), have considered the possibility that certain aggravating factors may be duplicative in such fashion, only to uphold those factors as sufficiently distinct. (*See Jones*, 527 U.S. at 398–400, 119 S.Ct. 2090; *U.S. v. Webster*, 162 F.3d 308, 324–325 (5th Cir. 1998), *cert. denied*, 528 U.S. 829, 120 S.Ct. 83, 145 L.Ed.2d 70 (1999).) With these core principles in mind, we turn to Defendants' specific challenges to the Government's death penalty notices.

## A. DUPLICATIVE AGGRAVATING FACTORS

■ K.K. Mohamed contends that two non-identical aggravating factors are impermissibly duplicative if they emanate from the same criminal act—i.e., a single statutory offense.[14] (Br. in Supp. of K.K.

---

13. In *Jones*, after pointing out that the Supreme Court has "never before held that aggravating factors could be duplicative so as to render them constitutionally invalid," the four-Justice plurality applied the "subsuming" theory of *McCullah* only "for the sake of argument." Even so, the plurality Justices did not expressly bar lower courts from using duplication as a basis for striking a challenged aggravating factor. (*Jones*, 527 U.S. at 398, 119 S.Ct. 2090.)

14. This is entirely distinct from the duplication issue (not raised by Defendants, but still pertinent to this case) of whether a single aggravating factor may itself be alleged more than once—i.e., once under each count of each capital offense for which a defendant has been convicted. For example, against Al-'Owhali, the Government seeks to apply the future dangerousness aggravator up to 258 separate times: once for an alleged violation of 18 U.S.C. § 844(f)(1) and (3); once for an alleged violation of 18 U.S.C. § 2332a(a); once for each of the 213 alleged violations of

Mohamed's Death Penalty Mots. at 72–73.) However, a chief function served by both aggravating and mitigating factors is to focus the jury's sentencing discretion on all relevant aspects of the crime at issue. A single violation of 18 U.S.C. § 1111 (murder), for example, may be driven by multiple motivations and result in multiple effects—all of which, if probative, should of course be considered by the penalty-stage jury. Taken to its logical conclusion, K.K. Mohamed's suggestion would permit the Government to propose only one aggravator for each criminal statute violated. Such a result would frustrate the FDPA's constitutionally-mandated goal of individualized capital sentencing.

█ Nevertheless, as indicated *supra*, there do exist circumstances in which two non-identical aggravating factors should be deemed impermissibly duplicative. Under a weighing death penalty scheme such as the FDPA, an aggravator that is entirely a subset of another "has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." (*McCullah*, 76 F.3d at 1111.) Such skewing occurs because the jury will be presented with an extra aggravating factor on death's side of the coin. And though trial courts may appropriately instruct juries to avoid simply counting the number of aggravators, "the mere finding of an aggravating factor cannot but imply a qualitative value to that factor." (*Id.* at 1112.) This danger of double-counting is inherent in any sentencing framework that seeks to channel a jury's discretion by confining its decision-making to a comparative evaluation of formalized categories.

█ Therefore, we hold that an aggravating factor that is necessarily and wholly subsumed by a different aggravator within the same death penalty notice is invalid per se and should not be submitted to the penalty jury for sentencing consideration. In doing so, we stress that the striking of such a duplicative aggravating factor does nothing to exclude the *evidence* that would otherwise have been proffered in support of the rejected factor. All such evidence, by definition, is necessarily subsumed under the surviving umbrella aggravator and thus remains relevant and admissible. Viewed in this practical light, it becomes clear that a duplicative aggravator of this sort serves no significant sentencing role other than to cloud the issues and place an unwarranted thumb on death's scale.

And as noted at the outset of this Opinion and in footnote fourteen *supra*, we will revisit some of the issues raised by this

---

18 U.S.C. § 930(c); once for each of the 41 alleged violations of 18 U.S.C. § 1114; and once for each of the 2 alleged violations of 18 U.S.C. § 1116.

If this were not a death penalty case and the Court were to impose sentence under the Sentencing Guidelines, "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." (U.S. Sentencing Guidelines Manual § 3D1.2 (2000).) This is a reflection of the basic principle that additional punishment should not be imposed for the same act. (*See id.* at ch. 3, pt. D, Introductory Commentary ¶ 4) ("In order to limit the significance of the formal charging decision and to prevent multiple punishment for substantially identical offense conduct, this Part provides rules for grouping offenses together.".) But in the death penalty context, the issue is not imposition of added punishment; it is rather whether the questioned aggravating factor, if found to be proven, tells the jury something about what the defendant did and intended to do which is not already contained in any other aggravator.

For purposes of comparison, we further note that a "grouping" approach with respect to sentencing aggravators was apparently taken in *U.S. v. McVeigh*, No. Cr–95–110–A (D.Colo.), the only other prosecution known by the Court that is comparable to the instant one. In the government's notices of intent to seek the death penalty as to defendants Timothy McVeigh and Terry Nichols (filed Oct. 20, 1995), each aggravating factor was alleged only once, even though both defendants faced 11 capital counts each.

At any rate, we postpone resolution of this important issue until after the jury has rendered its liability verdict, at which time there will be no need to speculate as to what particular counts in the indictment Defendants will be convicted of, if any.

motion after the liability phase of the case has been concluded and in light of the jury's verdict. The question of impermissible duplication is one which will receive close scrutiny by the Court.

### 1. *Grave Risk of Death to Additional Persons; Multiple Killings or Attempted Killings; Victim Impact Evidence*

■ Applying the above standard for invalid duplication, we conclude that the three non-identical aggravating factors of "grave risk of death to additional persons," "multiple killings or attempted killings," and "victim impact evidence" are sufficiently distinct from each other that we decline to strike them. The first relates to Defendants' mental state with respect to persons who were not the intended victims of the bombings.[15] The second focuses on Defendants' particular desire that there be multiple victims, rather than just one—i.e., the sheer magnitude of the crime. And the third highlights the objective human effects of Defendants' actions, as distinct from the Defendants' subjective mindset.

### 2. *Serious Injury to Surviving Victims*

■ We agree with Al-'Owhali (*see* Reply in Supp. of Al-'Owhali's Death Penalty Mots. at 5–6) that the non-statutory aggravating factor of "serious injury to surviving victims" is entirely and wholly subsumed by the "victim impact evidence" non-statutory aggravator, and is thus impermissibly duplicative. Both function to provide the jury with details concerning the widespread human trauma allegedly caused by the accused's criminal conduct, though the Government has apparently limited the former aggravator to surviving victims and the latter to deceased victims only.

Certainly, the deleterious effects of a capital defendant's actions are an appropriate subject of sentencing consideration. (18 U.S.C. § 3592(a); *Payne v. Tennessee,* 501 U.S. 808, 825–827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).) Yet, the Government's attempt to spin off multiple free-standing aggravators from what should really only be one represents a strategy that should not be permitted.[16] What is most problematic is the fact that, because such parsing of categories serves no evidentiary purpose (since such evidence would still be admitted under the aegis of the umbrella aggravator), the sole motivation for doing so is to ratchet up the number of aggravating factors and "give the government free reign to trump whatever mitigating factors are raised by the defendant." (*U.S. v. Bradley,* 880 F.Supp. 271, 285 (M.D.Pa. 1994).) Rather than risk confusing jurors with unnecessarily complex jury instructions, as is suggested by the Government, we think it wiser simply to consolidate the two non-statutory aggravators in question.[17] By doing so, we avoid the risk that double-counting will skew the weighing process to an unconstitutional degree, the Government suffers no cognizable prejudice, and the penalty jury is still afforded access to all relevant evidence relating to the terrible human consequences of the embassy bombings.

Accordingly, the Court orders that, as to both Defendants, the non-statutory aggravating factor of "causing serious injury to surviving victims" be stricken from the

---

**15.** A jury may find there to be a qualitative difference between a defendant who carefully targets an intended victim or victims without endangering others, and one who acts with indifference to "additional persons." Here, Americans or embassy employees may be perceived by the jury to be the intended victims and Kenyan or Tanzanian casual bystanders to be the "additional persons."

**16.** Indeed, even the two categories of deceased victims and surviving victims can be further subdivided according to various other personal characteristics of the victims (age, socioeconomic status, vulnerability) and the peculiar circumstances of their injuries (physical, psychological, economic).

**17.** And, as argued *supra,* an instruction alone is insufficient to solve the problem that, to a juror, the mere finding of an aggravating factor will imply a certain degree of independent qualitative significance.

Government's death penalty notices, and the non-statutory aggravating factor of "victim impact evidence" be amended to include any "injury, harm, and loss" suffered by victims and their families, whether the victims are deceased or surviving.

### 3. Death During Commission of Another Crime

■ Additionally, Al-'Owhali moves to strike the statutory aggravating factor of "death during commission of another crime" on grounds that it relies on predicate offenses that are duplicative of crimes already charged in the indictment. (Reply in Supp. of Al-'Owhali's Death Penalty Mots. at 4–5.) There is limited support for this proposition. (See U.S v. Kaczynski, 1997 WL 716487, *22–23 (E.D.Cal. 1997); McVeigh, 944 F.Supp. at 1489–90.) The reasoning relied upon is as follows: If the jury convicts a defendant for a given offense, it is highly likely that the same jury will also find the existence of an aggravator involving that offense. This supposedly "skews the weighing process by beginning the penalty phase with one aggravating factor already on death's side of the scale." (Kaczynski, 1997 WL 716487 at *23.) We disagree.

To begin, "[t]here is nothing wrong with permitting the jury during sentencing to consider crimes for which [the defendant] has been found guilty beyond a reasonable doubt." (U.S. v. Cooper, 91 F.Supp.2d 90, 108–109 (D.D.C.2000).) This is especially true when Congress has legislated that a defendant's concurrent commission of certain crimes shall be a probative consideration as to the overall gravity of a murder. (See 18 U.S.C. § 3592(c)(1).) Jurors, after all, should be given "guidance regarding the factors about the crime and the defendant that the State, representing organized society, deems particularly relevant to the sentencing decision." (Gregg, 428 U.S. at 192, 96 S.Ct. 2909.)

Second, the impermissible double-counting caused by an aggravator that is duplicative of another aggravator is simply not at issue here. (Cf. U.S. v. Frank, 8 F.Supp.2d 253, 277 (S.D.N.Y.1998)) ("[T]he jury may take into account as an aggravating factor at sentencing the circumstances of the crime—even if that information of necessity duplicates elements of the underlying offense—so long as the factor is not duplicative of another factor.") It is instead clear that, "once the penalty phase has begun, the jury [will be] asked to consider only once the fact that the [deaths] occurred during the commission of another crime. That the jury may find it relatively easy, based on its guilty verdict, to find the existence of this factor does not unfairly tip the scales toward death." (Frank, 8 F.Supp.2d at 276; see also U.S. v. Jones, 132 F.3d 232, 248–249 (5th Cir.1998); Cooper, 91 F.Supp.2d at 108–109.)

Third, we believe that preventing prosecutors at sentencing from making reference to the indicted crimes will only increase the risk of arbitrariness. "To expect the jury to shut out entirely the circumstances of the underlying offense at the penalty phase blinks reality." (Frank, 8 F.Supp.2d at 277.) The preferred practice of submitting the penalty determination to the same jury that decided liability is inconsistent with the concept of total separation of the nature of the underlying crimes from sentencing consideration. It is far more prudent, therefore, that the jury be guided as to how it should weigh the connection between a victim's death and Defendants' predicate crimes. Al-'Owhali's motion to strike the statutory aggravating factor of "death during commission of another crime" is denied.

### B. NON–STATUTORY AGGRAVATING FACTORS

#### 1. Targeting High Public Officials of the United States Serving Abroad

■ Defendants submit that the Government is barred from utilizing this non-statutory aggravating factor since there

already exists a statutory version under the FDPA that deals with victims that happen to be high public officials, and the scope of that extant statutory aggravator does not include high public officials serving abroad. (*Br. in Supp. of K.K. Mohamed's Death Penalty Mots.* at 76–77.) Such logic is unavailing. It erroneously assumes that each enumerated aggravating factor under the FDPA is designed to be exhaustive of the particular subject matter to which it is addressed. (*See Bradley,* 880 F.Supp. at 286.) But Congress allowed for the admission of non-statutory aggravating factors precisely because it could not foresee every criminal circumstance that might arise. Nor would Congress ever want to enumerate every possibly relevant consideration given the constitutional need for individualized sentencing. Moreover, the Government's proposed non-statutory aggravator is directed toward a distinct criminal circumstance: It calls attention, not merely to the victims' high public official status, but also to the fact that Defendants' actions were *motivated* by that very status. The Government's proposed non-statutory aggravating factor thus captures the relevant distinction between the mere effect of illicit behavior on the one hand, and its driving motivation on the other, in a way not reflected in the original statutory aggravator.[18] (*See McVeigh,* 944 F.Supp. at 1491.) We thus decline to strike the non-statutory aggravating factor of "targeting high public officials of the United States serving abroad."

### 2. Disruption to Important Governmental Functions

 Defendants argue that the non-statutory aggravating factor of "disruption to important governmental functions" concerns matters insufficiently severe "to warrant consideration of the death penalty." (Reply in Supp. of Al-'Owhali's Death Penalty Mots. at 4.) As such, this factor is irrelevant to the question of capital punishment and should be stricken from the Government's death penalty notices. We agree.

By looking initially to the list of statutory aggravators specified under the FDPA, we can discern a general outline as to what kinds of issues Congress believed were "of sufficient seriousness in the scale of societal values to be weighed in selecting who is to live or die." (*Friend,* 92 F.Supp.2d at 544; *see also Davis,* 912 F.Supp. at 943.) Such legislative guidance is particularly significant in this context because:

> [I]t should be presumed that Congress would not craft a statute which would defeat the fundamental objectives reflected in the Supreme Court's death penalty jurisprudence by relaxing the standards of reliability and relevance of nonstatutory aggravating factors when it so carefully defined the statutory aggravating factors and, in so doing, confined them to a strikingly high level of relevance and reliability. Indeed, to relax the standards for nonstatutory aggravating factors "would defeat the goal of guided and measurable jury discretion, and return us to an unconstitutional system where the death penalty is 'wantonly' and 'freakishly' imposed."

(*Friend,* 92 F.Supp.2d at 544 (quoting *Davis,* 912 F.Supp. at 943).)

We thus begin by making a controlling observation with respect to the FDPA. Among those statutory aggravating factors for homicide that concern the effects of a defendant's crime, all focus uniquely and narrowly on the crime's lethal effects—i.e., on the extent of human trauma involved. (*See* 18 U.S.C. §§ 3592(c)(1), (11) & (14).) This echoes the Court's own belief that not every consequence of a defendant's actions will support the imposition of capital punishment. Indeed, as the continuing effects of a crime ripple outwards from its core locus of human suffering, the rationale in favor of execution wanes. We conclude

---

**18.** The statutory aggravating factor mentions motivation "because of" official status only with respect to law enforcement officers. (18 U.S.C. § 3592(c)(14)(D)(iii).)

that the disruption of a government's embassy-centered functions, while serious, is simply not sufficiently indicative of a defendant's disdain for human life as to warrant submission as an aggravating factor for the jury's consideration.[19] It bears emphasizing that "[a] predicate to fulfilling the constitutional conditions for an aggravating factor is that the disputed factor be an aggravating factor in the first place." (*Cuff*, 38 F.Supp.2d at 287.) And so, with respect to both Defendants, we order that the non-statutory aggravating factor of "disruption to important governmental functions" be stricken from the Government's death penalty notices.

### 3. *Knowledge of Simultaneous Acts of Terrorism*

The Government seeks to introduce against Al-'Owhali a non-statutory aggravator based solely upon his "prior knowledge of the planned simultaneous bombing of the United States Embassy in Dar es Salaam, Tanzania." Al-'Owhali moves to strike this factor on grounds that it "does nothing to assist the jury in considering whether [he] should live or die." (Reply in Supp. of Al-'Owhali's Death Penalty Mots. at 3.) The Court find this to be a particularly difficult issue to resolve prior to trial. Al-'Owhali is named as a defendant in all six of the conspiracy counts contained in the indictment (Counts One through Six). The Tanzania bombing is alleged to have occurred as an overt act in furtherance of five of those conspiracies (Counts One through Five). And under classic conspiracy law, a conspirator is liable for any and all substantive offenses or reasonably foreseeable acts committed by his co-conspirators in furtherance of that conspiracy, even if conducted without his affirmative knowledge. (*See Pinkerton v. U.S.*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *Braverman v. U.S.*, 317 U.S. 49, 63 S.Ct.

99, 87 L.Ed. 23 (1942).) Here, the proposed aggravator indeed alleges that Al-'Owhali possessed such knowledge.

Yet the issue is not one of liability, but whether Al-'Owhali's knowledge is an appropriate non-statutory aggravating factor. The Government does not allege any participation by Al-'Owhali in the initiation, planning, or execution of the Tanzania bombing. The sole evidence that the Government proffers in support of this factor is that Al-'Owhali, just prior to his departure from Africa, stayed in the same hotel as did those defendants involved directly in the Dar es Salaam bombing, and also that he had knowledge of the nationality of the suicide bomber in the Tanzania attack. (Gov't Memo. in Response to Defs.' Death Penalty Mots. at 51.)

We are skeptical whether in the overall context of this case, this alleged knowledge of simultaneity is, by itself, sufficiently probative to warrant inclusion of it during sentencing as a freestanding aggravating factor. We deny the motion to strike at this time, but alert the parties as to the significant possibility that the Court may strike this aggravator after the evidentiary record is complete.

### 4. *Future Dangerousness*

■■■ The Supreme Court has discussed with approbative language the submission of a defendant's future dangerousness as a subject for a penalty jury's consideration. (*See Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994); *California v. Ramos*, 463 U.S. 992, 1002–03, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); *Jurek v. Texas*, 428 U.S. 262, 274–276, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976).) Not surprisingly, lower courts have uniformly upheld future dangerousness as a non-statutory aggravating factor in capital cases under the FDPA, including instances

---

19. We admit that there may exist other circumstances, not presently implicated in this case given the current state of the record, in which the governmental disruption is so severe and hazardous that it constitutes an overriding threat to lives and to national security—e.g., cutting off power to hospitals, poisoning of water supplies, etc. But in such instances, the risk to human life is manifestly at issue.

where such factor is supported by evidence of low rehabilitative potential and lack of remorse. (*See Kaczynski*, 1997 WL 716487 at *28; *Cooper*, 91 F.Supp.2d at 111–113; *Glover*, 43 F.Supp.2d at 1227; *U.S. v. Nguyen*, 928 F.Supp. 1525, 1542 (D.Kan.1996); *Davis*, 912 F.Supp. at 945–947; *U.S. v. Kee*, 2000 WL 863119, *8 (S.D.N.Y.2000); *Frank*, 8 F.Supp.2d at 279.) Defendants offer no compelling reason to depart from this collective wisdom. As such, we decline to rule that future dangerousness is per se an invalid aggravator.

Defendants have also moved to limit the evidence proffered by the Government in support of this non-statutory aggravating factor. More specifically, they assert: (1) that a defendant's silence alone may not be allowed to prove lack of remorse; (2) that a defendant's words alone cannot be used to establish future dangerousness; and (3) that all evidence of future dangerousness must be narrowly tailored to account for a defendant who faces a minimum sentence of life without parole, and thus will never re-enter society. (Reply in Supp. of Al-'Owhali's Death Penalty Mots. at 9–11.) These objections are more properly the subject of an evidentiary hearing to occur immediately before the penalty phase, assuming there to be such a phase. It is then that all parties, including this Court, will have a clearer sense of the possible sentencing ranges at stake and what specific evidence the Government seeks to introduce. Defendants may renew their evidentiary motions at that time.

## V. BILL OF PARTICULARS

■ Defendants move for a limited bill of particulars concerning the facts supporting the aggravating factors of "victim impact evidence" and "serious injury to surviving victims." (Br. in Supp. of K.K. Mohamed's Death Penalty Mots. at 103–105.) Although we have ordered that these two aggravators be combined into one (*see supra* Subsection IV.A.2.), all evidence previously admissible under the lat-

ter aggravator remains pertinent to the former.

The Government is correct that this Court's Sealed Order of December 4, 2000 moots Defendants' request for witness-identifying information. However, the unique concerns associated with that Order are not at issue with respect to Defendants' request that they receive particularization of the subject matter and scope of the Government's victim impact evidence. An oblique reference to victims' "injury, harm, and loss," without more, does nothing to guide Defendants' vital task of preparing for the penalty phase of trial. (*Cf. Glover*, 43 F.Supp.2d at 1224) ("The court finds that the defendant is entitled to greater specificity as to the 'serious physical and emotional injury the government claims the defendant caused [the victim].") That the range of human suffering—whether physical, emotional, or economic—is vast goes without saying.

Two practical considerations further heighten the Court's concern here. First, given the lengthy estimated duration of the trial's liability phase, the interregnum between verdict and sentencing should be minimized where possible. Second, the extraordinary number of victims in this case (most all located abroad) necessitates that any adequate preparation for sentencing will entail substantial investments of Defendants' time and energy.

Accordingly, in the exercise of its Rule 7(f) discretion, the Court orders that the Government provide Defendants with a limited bill of particulars specifying the particularized categories of "injury, harm, and loss" that will be proffered at sentencing, whether it be suffered by a victim or a victim's family. Beyond the subject matter of victim impact evidence, we also order that Defendants and the Court be informed of its quantity. In other words, how many victim-witnesses will be presented in support of a particular type of emotional injury? The Court envisions a document that is akin to an informative outline, but not a revelation of evidentiary

detail or the Government's theory of its case. And to the extent that individual descriptions would risk violating the Court's December 4th Sealed Order, no submission is required. The Government is ordered to provide the limited bill as soon as it is aware of the answer, or else in a reasonably timely manner prior to the penalty phase.

## VI. AMENDED DEATH PENALTY NOTICE As To K.K. MOHAMED

The Government has made a concurrent motion for leave to file an amended death penalty notice as to K.K. Mohamed. K.K. Mohamed has filed no objection, nor does the Court believe that the proposed amendment would in any way prejudice this defendant's rights since no new aggravating factors are being added. Rather, the Government seeks merely to supplement the notice with further evidentiary detail. (*See U.S. v. Battle*, 173 F.3d 1343, 1347 (11th Cir.1999), *cert. denied*, 529 U.S. 1022, 120 S.Ct. 1428, 146 L.Ed.2d 318 (2000)) (permitting government to amend notice, on eve of sentencing, when doing so would only "include specific evidence supporting an aggravating factor—future dangerousness—already in the original notice") Because we find that there exists good cause for the Government's request, as is required under 18 U.S.C. 3593(a), we grant the motion for leave to amend.

## VII. CONCLUSION

For the foregoing reasons, we: (1) order that, as to both Defendants, the non-statutory aggravating factor of "causing serious injury to surviving victims" be stricken from the Government's death penalty notices, and the non-statutory aggravating factor of "victim impact evidence" be amended to include any "injury, harm, and loss" suffered by victims and their families, whether the victims are deceased or surviving; (2) order that, as to both Defendants, the non-statutory aggravating factor of "disruption to important governmental functions" be stricken from the Govern-

ment's death penalty notices; (3) order that, as to Defendant Al-'Owhali, the non-statutory aggravating factor of "knowledge of simultaneous acts of terrorism" not be stricken from the Government's death penalty notice at the present time; (4) order that the Government provide Defendants with a limited bill of particulars, as defined in Part V of this Opinion; and (5) grant the Government's motion for leave to file an amended death penalty notice as to K.K. Mohamed. All of Defendants' other applications are denied, except that Defendants' remaining challenges to specific aggravating factors are denied without prejudice as set forth herein.

SO ORDERED.